

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-11-2002

# USA v. Panarella Jr.

Precedential or Non-Precedential:

Docket 01-1739

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Panarella Jr." (2002). *2002 Decisions*. Paper 14.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/14

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 11, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-1739

UNITED STATES OF AMERICA

v.

NICHOLAS PANARELLA, JR., Appellant

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Crim. No. 00-cr-00655)
District Judge: Honorable Marvin Katz

Argued: July 31, 2001

Before: BECKER, Chief Judge, AMBRO, and
WEIS, Circuit Judges.

(Filed January 11, 2002)

       RICHARD L. SCHEFF, ESQUIRE
        (ARGUED)
       JILL BAISINGER, ESQUIRE
       Montgomery, McCracken, Walker
        & Rhoads, LLP
       123 South Broad Street
       Philadelphia, PA 19109

       Counsel for Appellant

PATRICK L. MEEHAN, ESQUIRE
United States Attorney
ROBERT A. ZAUZMER, ESQUIRE
Assistant United States Attorney
Chief of Appeals
CATHERINE L. VOTAW, ESQUIRE

GREGORY A. PAW, ESQUIRE
  (ARGUED)
Assistant United States Attorneys
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

Counsel for Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

Defendant Nicholas Panarella, Jr. appeals from a judgment of the District Court convicting him of being an accessory after the fact to a wire fraud scheme by F. Joseph Loeper, Jr., then a Pennsylvania State Senator, to deprive the public of his "honest services" as a legislator. See 18 U.S.C. SS 3, 1343 & 1346. Panarella contends that the superseding information to which he unconditionally pleaded guilty failed to charge an offense, and alternatively, that his guilty plea lacked an adequate factual basis under Federal Rule of Criminal Procedure 11(f). Panarella does not dispute that the facts alleged in the superseding information are sufficient to charge him with being an accessory after the fact to Loeper's scheme to deprive the public of his "honest services" if, under the applicable law, such a scheme existed. Instead, Panarella contends that the facts alleged in the superseding information do not establish that Loeper committed "honest services" wire fraud in violation of 18 U.S.C. SS 1343 & 1346, and that Panarella therefore cannot be charged as an accessory.

Section 1343 provides, in relevant part, that

> [w]hoever, having devised . . . any scheme . .. to
> defraud, . . . transmits . . . by means of wire . . . in

2

interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.

Section 1346 elaborates on the meaning of "scheme to defraud," stating that "[f]or the purposes of this chapter, the term `scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." We will refer to this type of fraud as "honest services fraud."

Panarella argues that because the superseding information does not allege that Panarella's payments to Loeper were bribes, or that Loeper's actions as Senator were improperly influenced by the payments he received from Panarella, Loeper did not deprive the public of his honest services. According to Panarella, in the absence of such allegations, the mere fact that Loeper failed to disclose his income from Panarella's business while speaking and voting against proposed legislation that would have significantly harmed Panarella's business does not amount to honest services fraud.  The government responds that to establish that Loeper engaged in honest services wire fraud, it is not necessary to show that his actions as Senator were influenced by his financial relationship with Panarella, but only that Loeper unlawfully concealed a financial interest while taking discretionary action that directly benefitted that interest.

As a threshold matter, the parties dispute whether Panarella's challenge to the sufficiency of the superseding information is waived by his unconditional guilty plea. Panarella relies on our decisions in United States v. Cefaratti, 221 F.3d 502, 507 (3d Cir. 2000), and United States v. Spinner, 180 F.3d 514, 516 (3d Cir. 1999), and Federal Rule of Criminal Procedure 12(b)(2), which provides that "objections . . . that [the indictment or information] fails . . . to charge an offense . . . shall be noticed by the court at any time during the pendency of the proceedings." Maintaining that the fact that the charging language in the superseding information tracks the language of the relevant criminal statute is sufficient to conclude that it charges an

3

offense, the government attempts to distinguish challenges that an indictment or information fails to allege a necessary element of an offense, which the government concedes survive a guilty plea, from challenges that the specific facts alleged in an indictment or information are beyond the reach of the relevant criminal statute, which is what it submits is at issue in this case. Disagreeing with the government's position, we hold that Rule 12(b)(2) and our cases applying this Rule permit a defendant who enters an unconditional guilty plea to argue on appeal that the specific facts alleged in the charging document do not amount to a criminal offense.

Turning to the merits, we reject Panarella's claim that, because the superseding information contains no allegation that Panarella's payments to Loeper improperly influenced Loeper's actions as State Senator, the specific facts alleged in the superseding information fail to establish that Loeper deprived the public of his honest services. Rather, we hold that where a public official conceals a financial interest in violation of state criminal law and takes discretionary action in his official capacity that the official knows will directly benefit the concealed interest, the official has deprived the public of his honest services, regardless whether the concealed financial interest improperly influenced the official's actions. Moreover, because Panarella's challenge to his guilty plea under Rule 11(f) rests on the same legal theory as his challenge to the sufficiency of the superseding information -- namely, that there was an inadequate factual basis for concluding that Loeper's official conduct was improperly influenced by his income from Panarella -- we reject his Rule 11(f) challenge. Accordingly, we will affirm the judgment of the District Court.

I.

For purposes of determining the sufficiency of the superseding information, we assume the truth of the following facts alleged in the superseding information. Panarella operated a tax collection business that entered into contracts with various state and local government bodies to collect taxes owed to them under state and local

4

tax laws. In particular, Panarella's business received significant revenue from enforcement of Pennsylvania's "business privilege tax." Panarella developed special expertise and secured marketing advantages in enforcing the business privilege tax against non-resident businesses operating in the taxing jurisdiction but not having a physical place of business within the jurisdiction. His tax collection business depended largely on his ability to produce revenue for local governments by collecting Pennsylvania's business privilege tax from non-resident business. Beginning in 1993, he engaged Senator Loeper as a business consultant. Between 1993 and 1997, Panarella paid Loeper more than $330,000 for his consulting services.

Beginning in 1994, while Majority Leader of the Pennsylvania Senate, Loeper supported Panarella's business development efforts by appearing with him before local governments in Pennsylvania and attending meetings with him and the Secretaries of two Pennsylvania state agencies, the Department of Revenue and the Pennsylvania Higher Education Assistance Authority, in an attempt to obtain state collection contracts for Panarella. Moreover, in 1994 and 1995, Loeper spoke and voted against proposed legislation that would have restricted the enforcement of the business privilege tax against non-resident businesses and significantly harmed Panarella's business. These restrictions were eventually defeated.

While he was a Senator, Loeper failed to disclose his income from Panarella as required by 65 Pa. C.S.A. SS 1104(a) & 1105, filing false Statements of Financial Interest with the Pennsylvania Ethics Commission for the calendar years 1993 through 1997. To conceal his financial relationship with Loeper, Panarella directed third parties to make payments to Loeper on Panarella's behalf, although the government does not specifically allege that Panarella reimbursed these third parties. Then, in August of 1997, Loeper lied to a reporter about the sources of his income, and Loeper and Panarella asked a third party who paid Loeper on Panarella's behalf to lie to the reporter about the nature of the payments. In addition, Panarella edited the third party's response to a letter from the reporter inquiring into the basis for the third party's payments to Loeper.

5

A grand jury returned an indictment charging Panarella with seven counts of aiding and abetting mail fraud and wire fraud in violation of 18 U.S.C. SS 2, 1341, 1343 & 1346. Panarella moved to dismiss the indictment for failure to state a federal crime, but the District Court denied the motion. Represented by experienced counsel, Panarella subsequently signed a plea agreement in which he agreed to plead guilty to a superseding information charging him with one count of being an accessory after the fact to a wire fraud scheme to deprive the public of Loeper's honest services. The superseding information alleged that Loeper had engaged in an honest services wire fraud scheme in violation of 18 U.S.C. SS 1343 & 1346 and charged Panarella with being an accessory after the fact in violation of 18 U.S.C. S 3. Eschewing the benefit of Rule 11(a)(2), which permits the entry of a conditional plea of guilty under which the point reserved can be raised on appeal, Panarella entered an unconditional plea of guilty to the superseding information and was sentenced to six months imprisonment, one year of supervised release, and a fine of $20,000. As noted above, Panarella now challenges the sufficiency of the superseding information, and also the trial judge's determination under Rule 11(f) of the Federal Rules of Criminal Procedure that a sufficient factual basis existed to accept the guilty plea.

II.

Before reaching the merits of Panarella's claim that the facts alleged in the superseding information do not amount to honest services wire fraud, we must first decide whether Panarella's appeal is foreclosed by his unconditional guilty plea.

A.

Panarella submits that a challenge to the sufficiency of a charging document may be raised at any time, including on appeal after an unconditional guilty plea. He first invokes the rubric "jurisdictional," arguing that a"jurisdictional defense" survives an unconditional guilty plea, jurisdiction being a matter that can be raised at any time. He also relies

on the text of Federal Rule of Criminal Procedure 12(b)(2), which provides that an objection that "the indictment or information fails . . . to charge an offense . . . shall be noticed by the court at any time during the pendency of the proceedings." In Panarella's submission, the plain text of Federal Rule of Criminal Procedure 12(b)(2), together with our cases applying this rule, require us to reach the merits of his argument notwithstanding his unconditional guilty plea. The government counters that because Panarella did not enter, pursuant to Federal Rule of Criminal Procedure 11(a)(2), a conditional guilty plea reserving his right to challenge the sufficiency of the superseding information on appeal, he is precluded from now raising the issue. Because we hold that Rule 12(b)(2) requires us to entertain this appeal notwithstanding Panarella's unconditional guilty plea, we need not reach Panarella's alternative "jurisdictional" argument for why this appeal survives his guilty plea.1

We have squarely held that Rule 12(b)(2) applies equally to both objections raised before a District Court and objections raised for the first time before a Court of Appeals. See Gov. of the Virgin Islands v. Pemberton, 813 F.2d 626, 631 (3d Cir. 1987) ("This court has interpreted Fed. R. Crim. P. 12(b)(2) to mean that an objection to an information on the ground that it fails to charge an offense may be raised for the first time on appeal."); United States

_____

1. Apart from Rule 12(b)(2), the source of law on which Panarella's "jurisdictional" argument rests remains murky; it is unclear to us whether the argument relies on the Fifth Amendment's Grand Jury Clause, putative statutory or Article III limits on federal courts' subject
matter jurisdiction, or some rule of federal common law. Indeed, we are unsure whether use of the term "jurisdictional" to refer to challenges to the sufficiency of an indictment is anything more than simply a label used to announce the conclusion that a particular defense survives a guilty plea. See Peter Westen, Away from Waiver: A Rationale for the Forfeiture of Constitutional Rights in Criminal Procedure, 75 Mich. L. Rev.
1214, 1232 n.36 (1977) ("[O]nce we have explained why a certain category of defenses survives a plea of guilty, we may find it useful to describe the category as `jurisdictional' defenses. But calling a defense `jurisdictional' is a conclusion, not an explanation: it does nothing to explain why the defense should be deemed to survive a guilty plea." (internal citation omitted)).

v. Wander, 601 F.2d 1251, 1259 (3d Cir. 1979); United States v. Manuszak, 234 F.2d 421, 422 (3d Cir. 1956). See generally Fed. R. Crim. P. 1 ("These rules govern the procedure in all criminal proceedings in the courts of the United States, as provided in Rule 54(a) . . . ."); Fed R. Crim. P. 54(a) ("These rules apply to all criminal proceedings . . . in the United States Courts of Appeals . . . ."). We have also held that Rule 12(b)(2) applies even after a defendant has entered an unconditional guilty plea. See United States v. Cefaratti, 221 F.3d 502, 507 (3d Cir. 2000); United States v. Spinner, 180 F.3d 514, 516 (3d Cir. 1999).2

The government submits, however, that Rule 12(b)(2) does not apply in this case, because the superseding information does not "fail[ ] . . . to charge an offense." The government argues that, in interpreting Rule 12(b)(2), we should construe the phrase "fails . . . to charge an offense" narrowly, to cover only those cases where the charging instrument completely neglects to mention, even in general

_____

2. Both Cefaratti and Spinner permitted a defendant who had pleaded guilty to challenge the sufficiency of the charging document for the first time on appeal. While the positive law that Cefaratti and Spinner relied on is somewhat unclear, we read Spinner and Cefaratti as resting, at least in part, on Rule 12(b)(2). Cefaratti, in entertaining the defendant's
challenge, did not cite Rule 12(b)(2), but rather, cited only Spinner. See Cefaratti, 221 F.3d at 507 ("Although [defendant] did not raise this argument before the District Court, we will consider it in light of our prior holding that a defendant may challenge an indictment for failure to charge an offense for the first time on appeal."). Spinner, in turn, suggested that the rule that an unconditional guilty plea does not preclude an objection that an indictment fails to charge an offense has a constitutional basis. See Spinner, 180 F.3d at 515 ("The inclusion of all
elements . . . derives from the Fifth Amendment, which requires that the grand jury have considered and found all elements to be present.") (quoting United States v. Hooker, 841 F.2d 1225, 1230 (4th Cir. 1988) (en banc)). In addition to suggesting a constitutional basis for its holding,
however, Spinner also cited Rule 12(b)(2) as support for its statement that "[f]ailure of an indictment sufficiently to state an offense is a fundamental defect . . . and it can be raised at any time." 180 F.3d at 516. Moreover, the cases Spinner cited themselves squarely rested on Rule 12(b)(2). See United States v. Wander, 601 F.2d 1251, 1259 (3d Cir. 1979); United States v. Manuszak, 234 F.2d 421, 422 (3d Cir. 1956).

terms, an element of the offense. Thus, the government attempts to distinguish our decisions in Spinner and Cefaratti on the grounds that defendants in those cases argued on appeal that the charging instrument failed even to mention an essential element of the offense charged.

In Spinner, the statutory provision under which the defendant was convicted specifically required that "the offense affect[ ] interstate or foreign commerce." 18 U.S.C. S 1029(a). The indictment in Spinner, however, failed to mention interstate commerce. Spinner, 180 F.3d at 515. Similarly, in Cefaratti, the defendant, who was charged with engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. S 1957, argued that the information failed to allege an essential element of the offense -- that the criminally derived property was "proceeds obtained from a criminal offense," as required by 18 U.S.C. S 1957(f)(2). See Cefaratti, 221 F.3d at 507. Thus, in both Spinner and Cefaratti, the defendants pointed to specific statutory language that was an essential element of the crime charged and claimed that the charging instrument was deficient because it failed to allege that element.

The superseding information in this case charges that:

> On or about September 8, 1997, in the Eastern District of Pennsylvania, defendant Nicholas Panarella, Jr., knowing that an offense against the United States had been committed, namely, wire fraud in violation of Title 18, United States Code, Sections 1343 and 1346, knowingly and willfully assisted F. Joseph Loeper, Jr. in order to hinder and prevent Loeper's apprehension, trial and punishment by editing the response from S.R. to the reporter so as to continue to conceal the financial relationship between Panarella and Loeper, in violation of Loeper's duty to provide honest services.

Unlike in Spinner and Cefaratti, Panarella does not point to any specific statutory language that the charging instrument omitted. Indeed, the superseding information in this case tracks the language of the relevant statutory provisions nearly word for word. Rather, Panarella's claim is that the specific facts alleged in the superseding

9

information do not, as a matter of law, satisfy the elements of honest services wire fraud that the superseding information alleges.

More particularly, unlike the defendants' challenges in Spinner and Cefaratti, Panarella's challenge asks this Court to decide a question of statutory interpretation-- whether the federal wire fraud and honest services fraud statutes apply to the particular facts alleged in the superseding information. In Cefaratti, the defendant argued that the relevant criminal offense, as a matter of statutory interpretation, did not subsume the specific facts alleged. The court considered this argument not in the context of the indictment's sufficiency but in the context of defendant's challenge under Rule 11(f) that his guilty plea lacked a sufficient factual basis. See Cefaratti , 221 F.3d at 509-11. We thus believe the government's argument offers a plausible ground for distinguishing Spinner  and Cefaratti and for reading narrowly the language "fails . . . to charge an offense" in Rule 12(b)(2).

This interpretation of Rule 12(b)(2), however, is foreclosed by our decision in Government of the Virgin Islands v. Greenidge, 600 F.2d 437 (3d Cir. 1979). In Greenidge, the criminal statute under which the defendant was charged provided that "[w]hoever . . . with intent to commit rape . . . assaults another . . . shall be imprisoned not more than 15 years." 14 V.I. Code Ann. S 295(3) (1964). The information in Greenidge tracked this statutory language, alleging that "On or about the 11th day of February, 1978, in the Virgin Islands of the United States, . . . Rafael Greenidge. . . did, with the intent to commit rape, assault one Joseph Lekarzyk, in violation of Title 14 V.I.C., S 295(3)." Greenidge, 600 F.2d at 438. We nonetheless sustained Greenidge's argument, raised for the first time on appeal, that the information failed to charge an offense, holding that S 295(3) reaches only those cases in which the person assaulted is the same as the person whom the defendant intended to rape. Id. at 438-40. Since on the specific facts alleged in the information the person Greenidge assaulted was different from the person he attempted to rape, we found that the information failed to charge an offense. Id. Citing Rule 12(b)(2), we held that this objection to the

10

charging document may be raised for the first time on appeal. Id. at 439 n.2.

Greenidge is thus like this case, for the charging document tracked the relevant statutory language nearly word for word. And in both this case and Greenidge, the defendant argued that as a matter of statutory interpretation, the specific facts alleged in the charging document fall outside the reach of the relevant criminal statute. See Greenidge, 600 F.2d at 439 ("Greenidge contends that the Information . . . reflect[s] an improper interpretation of the statute."). Panarella argues that because the superseding information fails to allege that Panarella's payments to Loeper improperly influenced Loeper's actions as State Senator (and Majority Leader), the facts alleged in the superseding information fail to constitute the offense of honest services wire fraud. If, as the Court held in Greenidge, an indictment whose charging language tracks the relevant criminal statute nonetheless "fails . . . to charge an offense," for purposes of Rule 12(b)(2), when the specific facts alleged fall beyond the reach of the statute, Panarella's argument that the specific facts alleged in the superseding information do not amount to honest services wire fraud must also be an argument that the information "fails . . . to charge an offense."

To be sure, the defendant in Greenidge never pleaded guilty, but was tried and convicted. Nonetheless, Greenidge's interpretation of the phrase "fails . . . to charge an offense" in Rule 12(b)(2) is binding on us in this case, since Rule 12(b)(2) does not distinguish on its face between defendants who have pleaded guilty and those who have not. As long as Rule 12(b)(2) applies notwithstanding an unconditional guilty plea (and we held in Spinner and Cefaratti that it does), then we must construe it consistently both in cases where the defendant has pleaded guilty and in cases where the defendant has not.

We are thus constrained to reject the government's contention that an indictment or information charges an offense, for purposes of Rule 12(b)(2), as long as it recites in general terms the essential elements of the offense, even if the specific facts alleged in the charging instrument fail to satisfy those elements. Instead, we hold that, for

11

purposes of Rule 12(b)(2), a charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation. Therefore, notwithstanding Panarella's unconditional guilty plea, Rule 12(b)(2) permits Panarella to argue for the first time on appeal that the specific facts alleged in the superseding information do not amount to honest services wire fraud.

In reaching the merits of Panarella's argument notwithstanding his unconditional guilty plea, we join the Fifth, Ninth, and Eleventh Circuits, which have held that an objection that the relevant criminal statute does not reach the specific facts alleged in the charging document shall be noticed for the first time on appeal, even after defendant has pleaded guilty. See United States v. Tomeny, 144 F.3d 749, 751 (11th Cir. 1998) (permitting defendants who pleaded guilty to argue on appeal that the indictment failed to charge an offense because the general federal criminal false statement provision under which defendants were convicted, 18 U.S.C. S 1001, was "preempted" by the criminal false statement provision of the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. S 1857(1)(I)); United States v. Osiemi, 980 F.2d 344, 345 (5th Cir. 1993) (permitting a defendant who pleaded guilty to possession of a counterfeit passport in violation of 18 U.S.C. S 1546(a) to argue on appeal that S 1546(a) does not apply to possession of a counterfeit passport issued by a foreign government and that the indictment therefore fails to state an offense); United States v. Caperell , 938 F.2d 975, 977-78 (9th Cir. 1991) (holding that a defendant who pleaded guilty to charges related to the manufacture, distribution, and possession of a controlled substance may challenge the sufficiency of the indictment on the ground that the particular substance involved in the case-- methamphetamine -- had been approved by the FDA for use in non-prescription drugs and therefore was not a controlled substance); see also United States v. DiFonzo, 603 F.2d 1260, 1263 (7th Cir. 1979) (holding that a guilty plea does not preclude a defendant from arguing that"the indictment contradicts itself, and, more importantly, that the preliminary factual allegations of the indictment negate one of the elements of the offense charged").

12

We note that the Fourth Circuit reached a different conclusion in United States v. Borden, 10 F.3d 1058 (4th Cir. 1993), which held that as long as a charging document recites in general terms all the elements of the relevant offense, a defendant who pleads guilty is barred from arguing on appeal that the specific facts alleged fail to establish a predicate offense. See id. at 1063. Borden, however, contains no citation of Rule 12(b)(2), and therefore failed to reconcile its holding with Rule 12(b)(2)'s instruction that an objection that an indictment or information fails to charge an offense shall be noticed at any time during the pendency of the proceedings.

B.

Although for the reasons set forth above, our jurisprudence requires us to take up Panarella's contentions on the merits, in the interest of law reform, we explicate our belief that a rule permitting a defendant who enters an unconditional plea of guilty to challenge his conviction on the ground that the specific facts alleged in the charging instrument fail to constitute an offense has a number of harmful consequences. First, this rule reduces criminal defendants' incentives to raise defenses in a timely fashion in district court. Commentators have noted that the rule permitting defendants to challenge an indictment's failure to charge an offense at any time has led to strategic decisions by defendants to delay raising the defense. See 4 Wayne R. LaFave et al., Criminal ProcedureS 19.1(d), at 741 n.50 (2d ed. 1999) ("The facts of various cases indicate that the practice of sandbagging, by deliberately postponing the objection, continues as to these defects, particularly the failure to charge an offense.").

Allowing appeals such as this also undermines judicial economy and finality in criminal adjudication. Defendants convicted after pleading guilty have little to lose by arguing, either on direct or collateral review, that the statute under which they were convicted does not reach the conduct alleged in the charging instrument. Requiring a defendant to raise this defense before pleading guilty respects the proper relationship between trial and appellate courts and prevents the waste of judicial resources caused when a

13

defendant deliberately delays raising a defense that, if successful, requires reversal of the defendant's conviction and possibly reindictment.

Finally, by reaching the merits of Panarella's appeal, we interfere with the ability of defendants (within the Third Circuit) to waive their right to challenge the sufficiency of the charging document in exchange for concessions from the prosecution, thereby making it more difficult for defendants and prosecutors to enter plea agreements that benefit both the parties and society as a whole. 3 To illustrate, consider, for example, a defendant whose defense is that, as a matter of law, the relevant criminal statute should be interpreted in a way that would not reach the particular conduct that the defendant engaged in. Such a defense might present a close call as a legal matter, and after consultation with counsel, a defendant might decide that he would prefer to plead guilty in exchange for prosecutorial concessions rather than run the risk that his legal argument will be rejected by the court and that he will

_____

3. The Supreme Court recognized this point as early as Brady v. United States, 397 U.S. 742 (1970), where it observed that plea agreements benefit both prosecutors and defendants and play a fundamental role in our criminal justice system:

> For a defendant who sees slight possibility of acquittal, the advantages of pleading guilty and limiting the probable penalty are obvious -- his exposure is reduced, the correctional processes can begin immediately, and the practical burdens of a trial are eliminated. For the State there are also advantages-- the more promptly imposed punishment after an admission of guilt may more effectively attain the objectives of punishment; and with the avoidance of trial, scarce judicial and prosecutorial resources are conserved for those cases in which there is a substantial issue of the defendant's guilt or in which there is substantial doubt that the
> State can sustain its burden of proof. It is this mutuality of advantage that perhaps explains the fact that at present well over three-fourths of the criminal convictions in this country rest on pleas of guilty . . . .

Id. at 752 (footnotes omitted); see also Mabry v. Johnson, 467 U.S. 504, 508 (1984) ("[B]ecause each side may obtain advantages when a guilty plea is exchanged for sentencing concessions, the agreement is no less voluntary than any other bargained-for exchange." (footnote omitted)).

14

therefore be exposed to a greater sentence than he would have been had he pled guilty. However, at least in some cases, a prosecutor may be unwilling to allow the defendant to plead guilty to a lesser offense unless the defendant enters an enforceable agreement to forgo a subsequent challenge to the sufficiency of the specific facts alleged in the charging document.

Put differently, our holding potentially transforms every guilty plea into a conditional guilty plea with respect to the defense that the charging document fails to state an offense. Prosecutors may simply decline to enter plea bargains agreeing to conditional guilty pleas (at oral argument the Prosecutor represented that that is what happened in this case) or at least may not offer the defendant as good a "deal" for a conditional guilty plea. If a defendant may raise a particular defense on appeal notwithstanding an unconditional guilty plea, then there is no reason why a prosecutor would offer a concession in exchange for the defendant surrendering that defense. By reaching the merits of Panarella's claim, we thus establish a precedent that impedes the ability of a criminal defendant to enter an enforceable plea agreement whereby he surrenders the defense that, as a matter of statutory interpretation, the facts alleged in the charging document do not amount to a criminal offense, even when the defendant believes that surrendering such a defense is in his best interests. Cf. United States v. Mezzanatto, 513 U.S. 196, 208 (1995) ("A sounder way to encourage settlement is to permit the interested parties to enter into knowing and voluntary negotiations without any arbitrary limits on their bargaining chips.").4

_____

4. We have noted that the law governing enforceability of commercial contracts provides guidance in resolving questions arising from plea agreements. See United States v. Baird, 218 F.3d 221, 229 (3d Cir. 2000) ("Although a cooperative plea agreement is not altogether the same as a commercial arrangement, civil contract law is nevertheless an important and useful aid in interpretation."); United States v. Nolan-Cooper, 155 F.3d 221, 236 (3d Cir. 1998) ("Plea agreements, although arising in a criminal context, are analyzed under contract law standards."); see also Robert E. Scott & William J. Stuntz, Plea Bargaining as Contract, 101 Yale L.J. 1909, 1910 (1992) ("Properly understood, classical contract

It is highly doubtful that in this case, Panarella's trial
counsel, Edward S.G. Dennis, Jr., who was an experienced

_____

theory supports the freedom to bargain over criminal punishment."). For
the same reasons that voluntary commercial agreements generally make
both parties to the agreement better off ex ante, counseled, voluntary
plea agreements generally inure to the mutual benefit of both the
prosecution and the defense. As Professors Scott and Stuntz have
argued, a presumption that plea agreements are enforceable expands the
range of choices available to criminal defendants:

> [P]lea bargains deserve a presumption of enforceability . . . .
Parties
> who are denied either freedom to contract or freedom to exchange
> entitlements suffer unnecessary constraints on their choices . . .
.
> [V]oluntary exchange offers people more choices than they would
> otherwise enjoy and, other things being equal, more choice is
better
> than less.

Scott & Stuntz, supra, at 1913, 1918. A rule that a guilty plea forecloses
a defendant's right to contest the legal sufficiency of the specific facts
alleged in an indictment preserves the range of choice available to
defendants, since a defendant could choose either to: (1) plead guilty and
thereby waive any legal challenges that the relevant criminal statute
does not reach defendant's conduct (and get a better deal); or (2) enter
a conditional guilty plea preserving the right to appeal the sufficiency
of
the particular facts alleged in the indictment, see Fed. R. Crim. P.
11(a)(2) (providing for conditional guilty pleas).

To be sure, scholars have long criticized the plea bargaining process
on a variety of grounds, many of which question whether a plea
agreement presumptively makes both parties better off in the same way
that a commercial contract does. See, e.g., Albert W. Alschuler, The
Changing Plea Bargaining Debate, 69 Cal. L. Rev. 652 (1981). Defects
such as imperfect information, agency costs, and bilateral monopoly
infect the negotiation of guilty pleas, and because criminal convictions
are public goods, the parties to a plea agreement may fail to internalize
the costs that the agreement imposes on society. See generally Stephen
J. Schulhofer, Plea Bargaining as Disaster, 101 Yale L.J. 1979 (1992).
While these objections are forceful, they are objections to the entire
process of plea bargaining generally, and as such have largely been
rejected not only by the common experience of a generation of judges,
prosecutors, and defense lawyers, state and federal, but also by the
caselaw holding that counseled, voluntary plea bargains are
presumptively constitutional. See, e.g., Brady v. United States, 397 U.S.
742 (1970); McMann v. Richardson, 397 U.S. 759 (1970); Parker v. North
Carolina, 397 U.S. 790 (1970); see generally  Scott & Stuntz, supra, at

criminal defense lawyer as well as the former United States
Attorney for the Eastern District of Pennsylvania and
Assistant Attorney General of the United States in charge of
the Criminal Division, overlooked the particular legal
argument that Panarella makes on appeal. It is more likely
that Panarella, through counsel, deliberately chose to waive
this objection to the sufficiency of the information. For this
reason, this appeal is particularly troubling.

But it is at least conceivable that Mr. Dennis overlooked
the defense that Panarella here raises. If so, leaving aside
the possibility that Panarella may claim ineffective
assistance of counsel in a habeas proceeding under 28
U.S.C. S 2241, Panarella's guilty plea was not a deliberate
waiver of his argument that the superseding information
fails to charge an offense. Indeed, as Panarella points out,
the plea agreement contains no explicit waiver of
Panarella's right to appeal his conviction on these
particular grounds.5 Nonetheless, a guilty plea is presumed
to forfeit those defenses not explicitly reserved by entering
a conditional guilty plea. "[W]hen the defendant . . . admits
his guilt . . . he assumes the risk of ordinary error in either
his or his attorney's assessment of the law and the facts."
McMann v. Richardson, 397 U.S. 759, 774 (1970). To

_____

1910 ("The many academic arguments for abolishing (or at least severely
restricting) plea bargaining have thus been largely ignored."). There is
no
reason for concluding that a defendant's waiver of his challenge to the
factual sufficiency of an indictment is any more susceptible to defects in
the plea bargaining process than those waivers that courts have
consistently upheld, see, e.g., Tollett v. Henderson, 411 U.S. 258 (1973)
(holding that a guilty plea precludes defendant's challenge to the
exclusion of African-Americans from the grand jury); Gioiosa v. United
States, 684 F.2d 176, 180 (1st Cir. 1982) (holding that a guilty plea
precludes objections to an unlawful search and seizure).

5. In the written plea agreement, Panarella did waive his right to appeal,
but the waiver spoke only to Panarella's right to challenge a sentence
falling within the limits agreed to by the parties. We have held that a
right of appeal may be waived but that the terms of the waiver must be
strictly construed. United States v. Khattak, No. 00-4169, 2001 U.S. App.
LEXIS 26121 (3d Cir. Dec. 6, 2001). Hence, the plea agreement in this
case did not explicitly waive Panarella's right to appeal his conviction
on
the ground that the superseding information failed to charge an offense.

require a defendant to enumerate explicitly in a plea agreement each particular defense that the defendant is surrendering would be impractical and would unnecessarily increase the complexity of plea agreements.

The result that we are forced to reach is particularly unwise in view of Rule 11(a)(2), which permits a defendant to enter a conditional guilty plea explicitly reserving the right to raise certain defenses on appeal. By requiring us to entertain Panarella's appeal notwithstanding his unconditional guilty plea, Rule 12(b)(2) renders a conditional guilty plea under Rule 11(a)(2) pointless in cases such as this, and undermines the rule.

For the foregoing reasons, we urge the Judicial Conference Advisory Committee on Criminal Rules to consider amending Rule 12(b)(2) to prevent what has happened here, particularly in view of its amendments to Rule 11 allowing for conditional guilty pleas.6

III.

Turning to the merits of Panarella's defense, we must determine whether, on the facts alleged in the superseding information, Panarella is guilty under 18 U.S.C.S 3 of being an accessory after the fact to a wire fraud scheme to deprive the public of Loeper's honest services, in violation of 18 U.S.C. SS 1343, 1346. Panarella appears to concede that, on the facts alleged in the superseding information, if Loeper is guilty of committing honest services wire fraud in violation of SS 1343 and 1346, then he is guilty of being an accessory after the fact under 18 U.S.C. S 3. Thus, although Loeper is not a defendant in this case, the critical question is whether the facts alleged in the superseding information establish that Loeper committed honest services wire fraud.

The federal wire fraud statute provides, in relevant part:

_____

6. To be sure, there may be constitutional objections to precluding a defendant who enters an unconditional guilty plea from challenging his conviction on the grounds that the specific facts alleged in the charging document are beyond the reach of the relevant criminal statute, and in revisiting Rule 12(b)(2) the Committee ought to consider such issues.

> Whoever, having devised . . . any scheme . . . to defraud, . . . transmits . . . by means of wire . . . in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. S 1343. Section 1346 of Title 18 elaborates on the meaning of "scheme to defraud," stating that"[f]or the purposes of this chapter, the term `scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." Congress enacted S 1346 in response to the Supreme Court's decision in McNally v. United States, 483 U.S. 350 (1987), which overturned a long line of lower court decisions and held that the mail and wire fraud statutes did not reach schemes to defraud citizens of their intangible right to a public official's honest services, but rather were"limited in scope to the protection of property rights." Id. at 360. In interpreting S 1346, we therefore look to both post-McNally cases interpreting S 1346 and pre-McNally  cases interpreting S 1341 and S 1343 for guidance. See United States v. Antico, No. 00-1446, 2001 U.S. App. LEXIS 25318, at *41 n.16 (3d Cir. Nov. 28, 2001) ("[C]ommentary and judicial reflection indicate that [S 1346] was enacted to overturn McNally and restore the evolution of mail and wire fraud to its pre-McNally status."); United States v. Lopez-Lukis, 102 F.3d 1164, 1169 (11th Cir. 1997) ("[W]e consider pre-McNally cases as persuasive authority in evaluating the scope of honest services.").

"Honest services fraud typically occurs in two scenarios: (1) bribery, where a legislator was paid for a particular decision or action; or (2) failure to disclose a conflict of interest resulting in personal gain." United States v. Antico, No. 00-1446, 2001 U.S. App. LEXIS 25318, at *45 (3d Cir. Nov. 28, 2001); see also United States v. Woodward, 149 F.3d 46, 54-55 (1st Cir. 1998). Because the superseding information does not allege that Panarella bribed Loeper, the question presented by this appeal is under what circumstances nondisclosure of a conflict of interest rises to the level of honest services fraud.

19

The government argues that because the superseding information alleges that Loeper unlawfully concealed a financial interest while taking discretionary action that directly benefitted that interest, the information sufficiently alleges that Loeper committed honest services wire fraud. The superseding information alleges that from 1993 through 1997 Loeper filed false Statements of Financial Interest in violation of 65 Pa. C.S.A. SS 1104(a) & 1105, failing to report more than $300,000 in income that he received from Panarella for the consulting services that he provided to Panarella's tax collection business. The superseding information further alleges that during this time Loeper, while serving as Senate Majority Leader, spoke and voted against proposed legislation that would have significantly harmed Panarella's business by restricting the enforcement of the business privilege tax.7

_____

7. As a threshold matter, Panarella contends that in construing the superseding information, we should consider only the facts alleged in the charging paragraph, which reads:

> On or about September 8, 1997, in the Eastern District of
> Pennsylvania defendant Nicholas Panarella, Jr., knowing that an
> offense against the United States had been committed, namely, wire
> fraud in violation of Title 18, United States Code, Sections 1343
and
> 1346, knowingly and willfully assisted F. Joseph Loeper, Jr. in
order
> to hinder and prevent Loeper's apprehension, trial and punishment
> by editing the response from S.R. to the reporter so as to continue
> to conceal the financial relationship between Panarella and Loeper,
> in violation of Loeper's duty to provide honest services.

On the basis of this language, Panarella submits that the entire scheme to defraud alleged in the superseding information is limited to his efforts to conceal his financial relationship with Loeper from a reporter. We believe, however, that the allegation that Panarella edited S.R.'s response to the reporter defines only Panarella's participation as an accessory after the fact, and that the actual scheme to defraud the public of Loeper's honest services, to which Panarella was an accessory after the fact, is defined by the detailed factual allegations set forth in the body of the superseding information.

More particularly, although the charging paragraph refers to the "conceal[ment] [of] the financial relationship between Panarella and Loeper, in violation of Loeper's duty to provide honest services," we do not read this language as limiting the alleged violation of Loeper's duty

Panarella submits that these allegations alone are insufficient to establish that Loeper committed honest services wire fraud, since, as the government concedes, there is no allegation that Loeper sold his vote to Panarella or that Loeper's financial relationship with Panarella influenced Loeper's decision to speak and vote against the proposed legislation. We must decide, then, whether allegations that Loeper unlawfully concealed his income received from Panarella while taking discretionary action that Loeper knew would directly benefit Panarella amounts to a scheme to deprive the public of his honest services, or whether an additional allegation that Loeper's discretionary action was influenced by Panarella's payments is necessary.

For the reasons that follow, we hold that where a public official takes discretionary action that the official knows will directly benefit a financial interest that the official has concealed in violation of a state criminal law, that official has deprived the public of his honest services under 18 U.S.C. S 1346.

to provide honest services to concealment alone. Rather, we interpret this phrase as incorporating by reference the other facts specifically alleged in the body of the superseding information, such as the fact that Loeper took discretionary action as Pennsylvania Senate Majority Leader that directly benefitted Panarella and that Loeper filed false Statements of Financial Interest with the Pennsylvania Ethics Commission. To be sure, the superseding information does not explicitly allege that these facts constituted the scheme to defraud the public of Loeper's honest services, and a court should "not strain to interpret a defective indictment to be in conformity with [the mail or wire fraud statute]." United States v. Olatunji, 872 F.2d 1161, 1166 (3d Cir. 1989). Nonetheless, we do not believe that it is a stretch to read the superseding information as alleging that the detailed facts recited in the body of the superseding information as a whole amounted to honest services fraud. Moreover, because Panarella challenges the sufficiency of the superseding information for the first time on appeal, we must construe the information liberally. See United States v. Cefaratti, 221 F.3d 502, 507 (3d Cir. 2000) ("[W]hen a challenge is urged for the first time on appeal we will construe the indictment liberally in favor of validity.").

A.

In urging us to reverse his conviction, Panarella relies heavily on the Seventh Circuit's decision in United States v. Bloom, 149 F.3d 649 (7th Cir. 1998), which reversed the honest services fraud conviction of a Chicago alderman who in his private capacity as a lawyer advised a client to use a proxy bidder at a tax scavenger sale at which the client's property was being auctioned, thereby depriving the city of tax revenues. We believe that Bloom is distinguishable on its facts, because the alleged scheme to defraud in Bloom did not involve anything that the defendant did in his official capacity. The only wrongdoing in Bloom was advice given by the defendant in his private capacity as a lawyer. See Bloom, 149 F.3d at 655 (noting that the indictment "does not charge that [defendant] used his office in any way, let alone that he misused it"). In contrast, in this case, Loeper took discretionary action in his official capacity that directly benefitted an unlawfully concealed financial interest.

Although Bloom is distinguishable, Panarella asks us to adopt the specific limiting principle espoused by Bloom, which held that "[a]n employee deprives his employer of his honest services only if he misuses his position (or the information he obtained from it) for personal gain." Id. at 656-57. We see several problems with Bloom's definition of honest services fraud as limited to misuse of office for personal gain.

First, we believe that the notion of misuse of office for personal gain adds little clarity to the scope of S 1346. Panarella contends that because there is no allegation in the superseding information that Loeper sold his vote, there was no misuse of office for personal gain. The government responds that Loeper misused his office for personal gain because he concealed a financial interest while taking discretionary action directly benefitting that interest. This dispute between the government and Panarella as to whether, on the facts alleged in the superseding information, Loeper misused his office for personal gain illustrates the difficulty in applying the standard "misuse of office for personal gain" and suggests that this standard, rather than clarifying the meaning of "scheme or artifice to

22

deprive another of the intangible right of honest services," 18 U.S.C. S 1346, adds an extra layer of unnecessary complexity to the inquiry.

In addition to its lack of clarity, "misuse of office for personal gain" risks being both over-inclusive and under-inclusive as a limiting principle. To the extent that, as Panarella argues, misuse of office for personal gain does not cover a public official's nondisclosure of a conflict of interest, it is too narrow, since, as discussed below, nondisclosure of a conflict of interest in a fiduciary setting falls squarely within the traditional definition of fraud, and poses a similar threat to the integrity of the electoral system as that posed by misuse of office for personal gain. See Section III.C. Conversely, to the extent that "misuse of office for personal gain" would envelop anyone from an elected official who uses his position of power to seduce a young intern to a Senator who takes home pencils from the office supply cabinet for personal use, the standard is too broad. And to the extent that it is unclear whether the standard would cover the public officials in the examples above and in the case before us, it is too vague to cure whatever ambiguity exists in the meaning of honest services fraud.

Although the Bloom court stated that "[n]o case we can find in the long history of intangible rights prosecutions holds that a breach of fiduciary duty, without misuse of one's position for private gain, is an intangible rights fraud," id. at 656, such cases do exist, even in the Seventh Circuit. See, e.g., United States v. Bush, 522 F.2d 641 (7th Cir. 1975); see also United States v. Espy, 989 F. Supp. 17 (D.D.C. 1997), rev'd in part on other grounds , 145 F.3d 1369 (D.C. Cir. 1998). In Bush, the Seventh Circuit squarely held that the defendant's concealment of a conflict of interest amounted to honest services fraud, even though "[t]here is no concrete evidence of extortion, bribery, kickbacks, or a violation of any criminal law other than the mail fraud statute." Bush, 522 F.2d at 646 (footnote omitted). Although the Bloom panel asserted that "the indictment[ ] in . . . Bush . . . alleged that the defendant[ ] converted to private use information that [he] possessed by virtue of [his] public position[ ]," 149 F.3d at 655, we can

23

find no mention of this fact in the Bush opinion, and therefore cannot agree with the Bloom court that conversion of information to private use was the basis for the holding in Bush.

Rather than substituting one ambiguous standard for another in holding that an official deprives the public of his honest services only if he misuses office for personal gain, we believe that state law offers a better limiting principle for purposes of determining when an official's failure to disclose a conflict of interest amounts to honest services fraud. Cf. United States v. Brumley, 116 F.3d 728, 734-35 (5th Cir. 1997) (en banc) (using state law to define the contours of honest services fraud). Although we need not decide whether a violation of state law is always necessary for nondisclosure to amount to honest services fraud, we note that the clarity of Pennsylvania's disclosure statute criminalizing a public official's nondisclosure of his sources of income addresses rule of lenity concerns, see infra Section III.D, more effectively than does "misuse of office for personal gain." Moreover, the existence of a violation of state law in this case mitigates the federalism concerns that arise from federal prosecutions of local public officials, see infra Section III.B, in a way that "misuse of office for personal gain" does not.

Bloom considered the use of state law as a limiting principle, since the advice that the defendant in Bloom gave his client -- to use a proxy bidder at a tax scavenger sale at which the client's property was being sold -- counseled the client to engage in unlawful conduct. Ultimately, however, the Bloom court rejected the use of state law as a limiting principle:

> One way to cope with this problem [of the breadth of honest services fraud] would be to limit prosecutions to cases in which a defendant's acts not only violated a fiduciary duty but also transgressed some other rule of law. . . . As a limiting principle, this has two shortcomings. First, Bloom did not violate 35 ILCS 200/21-265(a)(1); only [Bloom's client] and the straw purchaser did so. Second, and more important, this line of argument has nothing to do with Bloom's status as an alderman. If advising a client to violate a state

24

> law in order to avoid paying taxes is a scheme to
> defraud the governmental body that should have
> received those taxes . . . , then every member of the bar
> would be as culpable as Bloom.

Bloom, 149 F.3d at 654. We find this reasoning
unpersuasive as a basis for rejecting use of state law as a
limiting principle.

The fact that Bloom did not violate the relevant state law
is in itself no reason to reject state law as a limiting
principle -- it simply shows that if state law is adopted as
a limiting principle, then Bloom did not commit honest
services fraud. Similarly, the fact that the state law "ha[d]
nothing to do with Bloom's status as an alderman" is not a
reason for rejecting as a limiting principle state law that
does relate to a defendant's status as a public official.
Under either the limiting principle adopted in Bloom, which
requires misuse of office for personal gain, or the limiting
principle that requires a violation of some state criminal
law regulating public officials, Bloom's conviction would
have been reversed. In our view, the Bloom court thus failed
to explain why misuse of office for personal gain provides a
sounder limiting principle than state law.

B.

We are mindful that the prosecution of state public
officials for honest services fraud raises federalism concerns
about the appropriateness of the federal government's
interference with the operation of state and local
governments. See McNally v. United States, 483 U.S. 350,
360 (1987) (refusing to "construe the [federal mail fraud]
statute in a manner that leaves its outer boundaries
ambiguous and involves the Federal Government in setting
standards of disclosure and good government for local and
state officials"). In our view, use of state law as a limiting
principle defining the scope of honest services fraud in
close cases better addresses these federalism concerns than
does the limiting principle of misuse of office for personal
gain, which Panarella urges upon us.

In this case, the intrusion into state autonomy is
significantly muted, since the conduct that amounts to

honest services fraud is conduct that the state itself has chosen to criminalize. See United States v. Antico, No. 00-1446, 2001 U.S. App. LEXIS 25318, at *43 n.18 (3d Cir. Nov. 28, 2001) ("[W]e need not reconcile the principles of federalism with S 1346 in this case because[defendant] owed a duty to the citizens of Philadelphia under state and local law."). See generally George D. Brown, Should Federalism Shield Corruption? -- Mail Fraud, State Law and Post-Lopez Analysis, 82 Corn. L. Rev. 225, 282-99 (1997). To be sure, the violation of Pennsylvania's disclosure statute is only a misdemeanor, see 65 Pa. C.S.A. S 1109(b), whereas violation of the federal mail fraud statute may result in up to five years imprisonment, see 18 U.S.C. S 1343. This disparity in punishment, however, may occur whenever federal criminal law defines predicate offenses by reference to state law. See, e.g., 16 U.S.C.SS 3372(a)(2) & 3373(d) (making it a federal criminal offense to transport, sell, or purchase fish or wildlife obtained in violation of state law); 18 U.S.C. S 1955 (making it a federal criminal offense to conduct a gambling operation in violation of state law).

Indeed, it is a truism that a healthy federalism involves some interposition of state and federal governments into each other's respective spheres of sovereignty. See Testa v. Katt, 330 U.S. 386 (1947) (requiring state courts of general jurisdiction to entertain claims predicated on federal law where Congress has conferred concurrent jurisdiction); Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938) (requiring federal courts sitting in diversity jurisdiction to apply and enforce state law); The Federalist No. 51, at 351 (James Madison) (Jacob E. Cooke ed., 1961) ("The different governments will controul each other; at the same time that each will be controuled by itself.").

In particular, federal prosecution of state and local public officials can play a beneficial role where state prosecutors are reluctant to bring charges against political allies or superiors. See United States v. Schermerhorn, 713 F. Supp. 88, 92 n.4 (S.D.N.Y. 1989) ("[O]ur own experiences in this court have taught us that numerous illegal kickback, election, and like schemes involving state and local officials are, for whatever reasons, often not prosecuted by state law

enforcers. It is empirically clear to us, therefore, that in the absence of federal intervention many of these political crimes would go unpunished, and perhaps worse, unnoticed or undiscovered."); Adam H. Kurland, The Guarantee Clause as a Basis for Federal Prosecutions of State and Local Officials, 62 S. Cal. L. Rev. 367, 377 (1989) ("For a variety of reasons, not all of them venal or corrupt, local prosecutors have generally been unable to prosecute local corruption consistently and effectively.").

C.

Rather than limiting honest services fraud to misuse of office for personal gain, we hold that a public official who conceals a financial interest in violation of state criminal law while taking discretionary action that the official knows will directly benefit that interest commits honest services fraud. See United States v. Woodward, 149 F.3d 46, 62 (1st Cir. 1998) ("A public official has an affirmative duty to disclose material information to the public employer. When an official fails to disclose a personal interest in a matter over which she has decision-making power, the public is deprived of its right either to disinterested decision making itself or, as the case may be, to full disclosure as to the official's motivation behind an official act." (quoting United States v. Sawyer, 85 F.3d 713, 724 (1st Cir. 1996))); United States v. Mandel, 591 F.2d 1347, 1363 (4th Cir. 1979), aff 'd 602 F.2d 653 (4th Cir. 1979) (en banc) ("Provided the requisite intent is shown, the official's failure to disclose the existence of a direct interest in a matter that he is passing on defrauds the public and pertinent public bodies of their intangible right to honest, loyal, faithful and disinterested government."); United States v. Keane, 522 F.2d 534, 546 (7th Cir. 1975) ("It is clear to us that one who breaches the public trust by actively concealing a personal financial interest from the public and from a public body charged with the responsibility of passing judgment on matters directly affecting that financial interest, and on which he serves and in which he participates in the formulation of collective judgment of that body, pursuant to his official duties, may be prosecuted for mail fraud."); see also United States v. Silvano, 812 F.2d 754, 759 (1st Cir. 1987) ("[A]n

27

employee's breach of a fiduciary duty falls within the strictures of the statute when it encompasses the breach of a duty to disclose material information to the employer.").

We acknowledge that in most cases upholding honest services fraud convictions based on concealment of a conflict of interest there was also an allegation of bribery or that the concealed conflict of interest improperly influenced the defendant's performance of his official duties. At least in some cases, however, courts have convicted solely on the basis of the defendant's intentional breach of a duty to disclose, without any allegation or evidence of bribery or other misuse of office. See United States v. Bush, 522 F.2d 641, 646 (7th Cir. 1975) (upholding an honest services conviction even though "[t]here is no concrete evidence of extortion, bribery, [or] kickbacks"); United States v. Espy, 989 F. Supp. 17, 25 (D.D.C. 1997), rev'd in part on other grounds, 145 F.3d 1369 (D.C. Cir. 1998) ("The law in this Circuit does not require allegations that a quid pro quo or selling of office is necessary for the indictment to support charges for honest services fraud."). Moreover, even where evidence of misuse of office in addition to mere nondisclosure exists, courts have explicitly disclaimed any reliance on such evidence in affirming defendants' convictions. See, e.g., United States v. Bronston, 658 F.2d 920, 926 (2d Cir. 1981) ("[T]he concealment by a fiduciary of material information which he is under a duty to disclose to another under circumstances where the non-disclosure could or does result in harm to the other is a violation of the statute. . . . [P]roof that the fiduciary relationship was used or manipulated in some way is unnecessary.").

We believe that our holding -- that a public official commits honest services fraud if he takes discretionary action that he knows directly benefits a financial interest that the official concealed in violation of state criminal law -- has a sound basis in both doctrine and policy. As a doctrinal matter, a public official's nondisclosure of a financial interest while taking discretionary action that the official knows will directly benefit that interest falls squarely within the classical definition of fraud. "Fraud in its elementary common law sense of deceit . . . includes the deliberate concealment of material information in a setting

28

of fiduciary obligation." United States v. Holzer, 816 F.2d 304, 307 (7th Cir. 1987), vacated and remanded for consideration in light of McNally, 484 U.S. 807 (1987); see also United States v. Dial, 757 F.2d 163, 168 (7th Cir. 1985) ("Fraud in the common law sense of deceit is committed by deliberately misleading another by words, by acts, or, in some instances -- notably where there is a fiduciary relationship, which creates a duty to disclose all material facts -- by silence."). As explained below, the facts alleged in the superseding information in this case sufficiently establish that: (1) Loeper had a duty, both under state common law and state criminal law, to disclose material information to the public; (2) Loeper deliberately concealed his income received from Panarella; and (3) this information was material. We thus find that Loeper's conduct falls squarely within the definition of fraud, in its classical sense.

Both at common law and under Pennsylvania criminal law, Loeper had a duty to disclose to the public material information. "A public official is a fiduciary toward the public, . . . and if he deliberately conceals material information from them he is guilty of fraud." Holzer, 816 F.2d at 307; see also United States v. deVegter , 198 F.3d 1324, 1328 (11th Cir. 1999) ("Public officials inherently owe a fiduciary duty to the public . . . ."); United States v. Sawyer, 85 F.3d 713, 733 n.17 (1st Cir. 1996) ("[T]he obligation to disclose material information inheres in the legislator's general fiduciary duty to the public."). This common law duty to disclose is codified by Pennsylvania statute, which requires public officials to file annual Statements of Financial Interest and criminalizes intentional misrepresentations in these statements. See 65 Pa. C.S.A. SS 1104(a), 1105 & 1109(b).

By lying about his income, Loeper breached this duty to disclose. The information that Loeper allegedly concealed in this case -- his financial relationship with Panarella -- was material because at the time Loeper misrepresented the information, he was taking discretionary action that directly benefitted Panarella's business. Cf. Holzer, 816 F.2d at 307 ("The standard of materiality is an objective one; it does not reach every piece of information that a particular litigant

29

might like to have about a judge. A judge need not disclose information that would not make a reasonable person think him incapable of presiding impartially in the case."). In this case, however, Loeper, as a Pennsylvania Senator and in the powerful position of Senate Majority Leader, both spoke and voted against proposed legislation that would have directly harmed Panarella's business. The information that Loeper concealed was therefore material, since knowledge of Loeper's income from Panarella would have been relevant both to Loeper's colleagues in assessing Loeper's comments when deciding how to vote on the bill, and to the electorate in assessing whether Loeper placed his financial self-interest above the public interest. Moreover, on the facts alleged in the superseding information, Loeper clearly knew that his discretionary action would directly benefit Panarella's business, given Loeper's familiarity with both the nature of the proposed legislation and the nature of Panarella's business.

We thus conclude that because Loeper deliberately concealed a financial interest in violation of Pennsylvania criminal law, while taking discretionary action that he knew directly benefitted that interest, his conduct constituted a scheme to deprive the public of his honest services for purposes of S 1346.

As a matter of policy, we believe this result is justified by the central role of disclosure in a well-functioning representative democracy. Critical to the health of the electoral process is the voters' ability to judge whether their representatives are acting to further their own financial self-interest instead of the public interest. As noted in the margin, the requirement under Pennsylvania law that elected representatives disclose their sources of income serves a purpose analogous to that served by federal laws requiring candidates for federal office to disclose the source of their campaign contributions.8

_____

8. In discussing these disclosure requirements, the Supreme Court has observed:

> [D]isclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the

30

The criminal penalties that Pennsylvania law attaches to a public official's concealment of a financial interest affirm the crucial role of disclosure in the electoral process. See 65 Pa. C.S.A. S 1101.1(a) ("[P]eople have a right to be assured that the financial interests [of public officials] do not conflict with the public trust. Because public confidence in government can best be sustained by assuring the people of the impartiality and honesty of public officials, this chapter shall be liberally construed to promote complete financial disclosure as specified in this chapter.").

Were it easy to detect and prosecute public officials for bribery, the need for public officials to disclose conflicts of interest would be greatly reduced. As long as a public official does not act on a conflict of interest, the conflict of interest by itself poses little threat to the public. One reason why federal and state law mandates disclosure of conflicts of interest, however, is that it is often difficult or impossible to know for sure whether a public official has acted on a conflict of interest. Cf. Holzer, 816 F.2d at 308 ("How can anyone prove how a judge would have ruled if he had not been bribed?"). The only difference between a public official who accepts a bribe and a public official who receives payments while taking discretionary action that benefits that payor, as Loeper did in this case, is the existence of a quid pro quo whereby the public official and the payor agree that the discretionary action taken by the public official is in exchange for payment. Recognizing the practical difficulties in proving the existence of such a quid

_____

      candidate in order to aid the voters in evaluating those who seek
      federal office. . . . The sources of a candidate's financial
support . . .
      alert the voter to the interests to which a candidate is most
likely to
      be responsive and thus facilitate predictions of future performance
      in office.

Buckley v. Valeo, 424 U.S. 1, 66-67 (1976) (internal quotation marks and footnote omitted); see also Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 408 (2000) (Kennedy, J., dissenting) (noting that disclosure of campaign contributions allows the public to "judge for itself whether the candidate or the officeholder has so overstepped that we no longer trust him or her to make a detached and neutral judgment").

pro quo, disclosure laws permit the public to judge for itself whether an official has acted on a conflict of interest.

To sum up, we reject Panarella's argument that an allegation of bribery or other misuse of office is necessary to sustain a conviction for honest services wire fraud. Rather, for the reasons discussed above, we hold that if a public official fails to disclose a financial interest in violation of state criminal law and takes discretionary action that the official knows will directly benefit that interest, then that public official has committed honest services fraud.

D.

Panarella argues that the rule of lenity dictates that we construe S 1346 narrowly to exclude from its scope a public official who conceals a financial interest while taking discretionary action that directly benefits that interest. The rule of lenity, which requires that ambiguities in criminal statutes be resolved against the government, "serves to ensure both that there is fair warning of the boundaries of criminal conduct and that legislatures, not courts, define criminal liability." Crandon v. United States , 494 U.S. 152, 158 (1990); see also United States v. Sanders , 165 F.3d 248, 251 (3d Cir. 1999).

We note that, as a textual matter, it is not a strained reading of S 1346 to hold that a public official who deliberately lies about his income while taking discretionary action in his official capacity that directly benefits his concealed financial interest "deprives [the public] of the intangible right of honest services." At all events, our criminal law contains numerous statutes whose construction and application pose difficulties in interpretation. See, e.g., 15 U.S.C. S 1 (criminalizing "[e]very contract, combination . . . , or conspiracy in restraint of trade"). Deprivation of honest services is perforce an imprecise standard, and rule of lenity concerns are particularly weighty in the context of prosecutions of political officials, since such prosecutions may chill constitutionally protected political activity. Moreover, decisions of our own Court stating that "fraud is a broad

32

concept that `is measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community,' " United States v. Monostra, 125 F.3d 183, 186 (3d Cir. 1997) (quoting United States v. Goldblatt, 813 F.2d 619, 624 (3d Cir. 1987)), do little to allay fears that the federal fraud statutes give inadequate notice of criminality and delegate to the judiciary impermissibly broad authority to delineate the contours of criminal liability.

We believe that the policies underlying the rule of lenity are not implicated in this case, however, because Loeper's deliberate concealment of his income from Panarella clearly violated a Pennsylvania criminal statute, 65 Pa. C.S.A. SS 1104(a), 1105 & 1109(b). This statute gave both Loeper and Panarella unambiguous notice that Loeper's nondisclosure was criminal. A public official who deliberately chooses to lie about an income source in violation of a criminal law clearly imposing a duty to disclose does so at his peril. The subsequent efforts taken by Panarella and Loeper to conceal Loeper's initial misrepresentation further undermine any claim of inadequate notice. See United States v. Holzer , 816 F.2d 304, 309 (7th Cir. 1987), vacated and remanded for consideration in light of McNally, 484 U.S. 807 (1987) ("Elaborate efforts at concealment . . . are powerful evidence that a defendant's conduct violates an ethical standard well known to him and to the whole community, and not just something thought up after the fact by a perhaps overly sensitive federal judge."); Dial, 757 F.2d at 170 ("The defendants' elaborate efforts at concealment provide powerful evidence of their own consciousness of wrongdoing."). Finally, the existence of a clear violation of Pennsylvania criminal law complies with the separation of powers principle requiring legislatures, not courts, to define criminal conduct.

E.

In sum, we hold that where a public official conceals a financial interest in violation of a criminal disclosure statute and takes discretionary action in his official

33

capacity that he knows will directly benefit that interest, the official has engaged in "a scheme or artifice to deprive [the public] of the intangible right of honest services." 18 U.S.C. S 1346. Concomitantly, we emphasize the narrowness of our holding. First, Loeper's nondisclosure was in clear violation of Pennsylvania criminal law. The existence of this violation of state law resolves federalism and vagueness concerns that might otherwise arise in cases such as this.9 Second, Loeper took discretionary action in his official capacity that he knew would benefit his undisclosed financial interest. This action rendered the information that Loeper concealed material, since the public would find the information relevant in assessing Loeper's voting record. Finally, our holding is limited to public officials, and does not reach private officials' breach of a fiduciary duty to disclose. Because disclosure is critical to the electoral process, unlawful concealment of conflicts of interest by public officials implicates weightier concerns than breaches of fiduciary duty by persons who do not hold public office. See John C. Coffee, Jr., Modern Mail Fraud: The Restoration of the Public/Private Distinction , 35 Am. Crim. L. Rev. 427, 462 (1998) ("[T]he victims of public corruption lack any right of exit. Put simply, they cannot

_____

9. Although we hold that the existence of a violation of state law, coupled
with the other facts discussed above, is sufficient to establish honest services wire fraud in this case, we need not decide whether a violation of state law is necessary for nondisclosure of a conflict of interest to amount to honest services fraud. Our decision in United States v. Antico, No. 00-1446, 2001 U.S. App. LEXIS 25318 (3d Cir. Nov. 28, 2001), suggested in dicta that a violation of state law is not necessary for nondisclosure of a conflict of interest to constitute honest services fraud.
See id. at *49 ("Duties to disclose material information affecting an official's impartial decision-making . . . exist within this fiduciary relationship regardless of state or local law codifying a conflict of interest."). However, since the defendant's nondisclosure in Antico violated state law, the Antico court, like this Court, did not have occasion
to hold squarely that a public official who does not violate state law may nonetheless be guilty of honest services fraud for failing to disclose a conflict of interest. See id. ("When coupled with the duty imposed by state and local conflict of interest laws, Antico's failures to disclose his
finanicial business arrangement with Ricciardi and to recuse himself from taking action with respect to her applications fall within the scope of honest services fraud.").

34

change governments. But investors can change investments.").

We believe that the narrowness of our holding, and in particular our reliance on Loeper's violation of Pennsylvania criminal law as a limiting principle, avoids the parade of horribles envisioned by those who fear overly broad application of the federal mail and wire fraud statutes. See United States v. Bloom, 149 F.3d 649, 654 (7th Cir. 1998) (arguing that under the prosecution's theory, "every city employee would be required to shop exclusively in Chicago in order to maximize its receipts from sales taxes, and would be guilty of a federal felony if he bought a pair of boots through the mail from L.L. Bean"); United States v. Margiotta, 688 F.2d 108, 140 (2d Cir. 1982) (Winter, J., dissenting) (fearing that "[a] partisan political leader who throws decisive support behind a candidate known to the leader to be less qualified than his or her opponent because that candidate is more cooperative with the party organization, is guilty of mail fraud unless that motive is disclosed to the public").

IV.

Finally, we address Panarella's argument that his guilty plea lacked an adequate factual basis, as required by Federal Rule of Criminal Procedure 11(f). Rule 11(f) provides that "[n]otwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea." This rule is intended to "protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the charge." McCarthy v. United States, 394 U.S. 459, 467 (1969).

Because Panarella's argument that his guilty plea lacked an adequate factual basis rests primarily on the same argument that the superseding information failed to charge an offense, we reject his Rule 11(f) challenge. 10 Since we

_____

10. Panarella also argues that in reviewing the factual basis for his guilty
plea, we should consider only the following exchange with the District Court at his plea colloquy:

35

would reach the same result under either a plain error or abuse of discretion standard of review, we need not decide the question of the appropriate standard of review where, as in this case, a defendant fails to raise a Rule 11(f) challenge before the district court, e.g., by moving to withdraw the plea. See United States v. Cefaratti, 221 F.3d 502, 509 & n.3 (3d Cir. 2000) ("A district court's finding of

_____

> THE COURT: All right. Just to be absolutely certain, Mr. Panarella, did you help Mr. Loeper continue the false disclosure form that he filed, the story about the false disclosure form that he filed in 1993, by some things that you did in 1997?
>
> THE WITNESS: Yes.
>
> THE COURT: That's what I want to be comfortable with. I'm satisfied that the defendant is competent to plead. The plea is voluntary, and not the result of force or threats or any promises, apart from the plea agreement which has been fully disclosed on this record.
>
> There is, I'm comfortable, a factual basis for the plea of guilty, along with accessory after the fact for Mr. Panarella's involvement in assisting Mr. Loeper in covering up Mr. Loeper's false cover story.

Panarella contends that this exchange shows that the trial judge relied solely on the admission quoted above, and that in reviewing the District Court's Rule 11(f) finding, we may therefore consider only this admission. Panarella submits that by itself the admission quoted above provides an inadequate factual basis for accepting his guilty plea, even if the theory charged in the superseding information is valid.

We do not agree that, in concluding that Panarella's guilty plea had an adequate factual basis, the District Court relied exclusively on the admission quoted above. Before this admission, the government summarized the facts that it would prove at trial, which included Loeper's concealment of his payments from Panarella and the discretionary action taken by Loeper that directly benefitted Panarella. After this summary, the court asked the defendant, "Mr. Panarella, do you agree with the prosecutor's summary of what you did?" Panarella replied "Absolutely." We therefore conclude that the factual basis for Panarella's guilty plea that the trial judge relied on included the government's summary of what it would prove at trial, and Panarella's admission that he "absolutely" agreed with the summary. This admission, together with the admission quoted above, provided an adequate factual basis for Panarella's guilty plea.

36

a factual basis for a plea is reviewed for an abuse of discretion. . . . The government maintains that Cefaratti's failure to raise this issue before the District Court necessitates plain error review -- an issue on which there is some disagreement in the courts. We need not decide this issue in light of our disposition." (citations omitted)).

For the foregoing reasons, the judgment of the District Court will be affirmed.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

37