**UNITED STATES of America,
Appellant**

v.

**Thomas D. CARBO, Appellee.**

No. 07–3576.

United States Court of Appeals,
Third Circuit.

Argued Oct. 30, 2008.

Filed: July 9, 2009.

Robert A. Zauzmer, Chief of Appeals, Richard J. Zack, Paul L. Gray, (Argued), Assistant United States Attorneys, Philadelphia, PA, for Appellant.

Robert J. Donatoni (Argued), West Chester, PA, for Appellee.

Before: SLOVITER, STAPLETON and TASHIMA *, Circuit Judges.

## OPINION

TASHIMA, Circuit Judge:

Thomas D. Carbo was convicted of conspiracy and honest services mail fraud for his role in a scheme to conceal conflicts of interest in the awarding of government contracts by an official of the Borough of Norristown, Pennsylvania (the "Borough"). The District Court overturned the conviction and granted a judgment of acquittal on the ground that the prosecution failed to produce sufficient evidence of Carbo's specific intent to defraud. We reverse.

## I. JURISDICTION & STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have appellate jurisdiction pursuant to 28 U.S.C. § 1291. The grant of a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 is reviewed de novo. *United States v. Bobb,* 471 F.3d 491, 494 (3d Cir.2006). In determining whether evidence is sufficient to sustain a conviction, a court "must view the evidence in the light most favorable to the government, and will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Smith,* 294 F.3d 473, 478 (3d Cir.2002) (internal quotation marks omitted).

---

* The Honorable A. Wallace Tashima, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The fraud at issue in this case began with Anthony Biondi, who as Borough administrator was responsible for the day-to-day operations of Norristown government. Among Biondi's responsibilities was contracting for basic services on behalf of the Borough. For most of the time period relevant to this case, Borough contracts were not awarded by a formal bidding process. Instead, when making contracts worth $10,000 or more, Biondi was authorized to choose from a list of approved contractors. In cases of smaller contracts, Biondi could select any contractor he wanted.

In 2001, Biondi became nervous that a new mayor of Norristown would be elected and would appoint a new Borough administrator to replace Biondi.[1] In order to establish a financial safety net for himself, Biondi decided to buy a used Mack truck that he could hire out to local contractors. The ownership of a second business was not forbidden under either state or local ethics laws, but his business venture did subject Biondi to disclosure requirements designed to avoid conflicts of interest by public officials. The Pennsylvania Public Official and Employee Ethics Act requires state and local employees to file annual statements disclosing all outside employment and income in excess of $1,300. 65 PA. CONS.STAT. § 1104(a). The violation of this act is a misdemeanor. *Id.* § 1109(b). Similarly, the Home Rule Charter of the Borough of Norristown in effect at the time of the events in this case required all Borough employees to disclose any financial interest they had with entities proposing to contract with the Borough, and to recuse themselves from decisions involving such contracts. 346 PA.CODE § 41.10–1002(B).

Biondi failed to disclose his new business as required and engaged in flagrant conflicts of interest, renting his truck out to some of the same contractors to whom he awarded Borough contracts. His primary partner in this enterprise was Lawrence Mazzerle, the co-owner of Pottstown Contracting, a company that was on the list of approved Borough contractors that Biondi hired to do paving and snow-removal work for the Borough. Biondi and Mazzerle shared the cost of the truck and, in the hope of avoiding detection by local and state officials, kept the truck titled and insured in the name of Pottstown Contracting. Mazzerle kept the truck at his business and would generally pay Biondi $460 per day for use of the truck. Biondi insisted that Mazzerle pay him in cash, and he also told Mazzerle not to use the truck inside the Borough, so that others who knew that Biondi owned the truck would not think that Biondi was engaged in self-dealing by awarding business to contractors that hired his truck. On at least two occasions, Biondi told Mazzerle that he (Biondi) was not allowed to have an extra source of income in addition to his Borough salary. He also told Mazzerle that he was required to report any additional source of income.

Carbo played a similar, but lesser, role to Mazzerle in assisting Biondi's illegal scheme. Carbo, like Mazzerle, owned a contracting business called Tommy's Paving and Excavating. Tommy's contracted with the Borough, but its contracts were on a smaller scale because it was not on the list of approved Borough contractors

---

1. As it happened, Biondi's concern was unfounded. The mayor was reelected, and Biondi remained in office throughout the events at issue here. Biondi was ultimately removed from office in 2004 shortly after Norristown enacted a new Home Rule Charter and the position of mayor was eliminated.

that were eligible to receive contracts worth more than $10,000. Carbo's company was also employed at times as a subcontractor for Mazzerle's business. In a conversation with Carbo that was secretly recorded by a government informant, Carbo denied that he had given Biondi any improper payments or favors in return for work, but at the same time he recognized the need for secrecy in dealing with Biondi in order to avoid attracting government attention. When Carbo rented Biondi's Mack truck, he apparently paid Biondi in cash and did not enter the information of payments to Biondi in the Quickbooks software he otherwise used to manage the accounting for his business. In the records Carbo did keep regarding his payments to Biondi, he did not refer to Biondi by name, instead filing the payments under the name "Number 1 Contracting Corp."

Eventually, when Biondi decided to trade up to a newer Peterbilt truck, Carbo offered to buy the older Mack truck from Biondi. Carbo appears to have tried to disguise the price he paid for the truck and the identity of the recipient of those payments. Only $500 in cash went directly to Biondi. Carbo paid up to $4,500 in cash and $10,000 in a bank check to Pottstown Contracting, Mazzerle's company. In addition, Carbo paid over $2,400 to a truck painting company to have Biondi's new Peterbilt truck repainted. These payments either did not appear in Carbo's books at all, or were identified under misleading names that would not indicate that they were used to purchase a truck or paid for the benefit of Biondi. Carbo was aware that Biondi kept his new Peterbilt truck titled in the name of Pottstown Contracting.

In late 2003, the Pennsylvania State Ethics Commission began investigating Biondi's failure to report his outside income, and, ultimately, Carbo, Biondi, and Mazzerle were charged with honest services mail fraud. Biondi and Mazzerle both pled guilty, while Carbo went to trial and was convicted of honest services mail fraud in violation of 18 U.S.C. §§ 1341, 1346, and conspiracy to commit honest services mail fraud in violation of 18 U.S.C. § 371. Carbo moved for a judgment of acquittal pursuant to FED.R.CRIM.P. 29, which the District Court granted. The government timely appealed.

## III. ANALYSIS

Honest services mail fraud is a specific form of mail fraud, 18 U.S.C. § 1341, in which an offender uses the mails to engage in a "scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. The most obvious form of honest services fraud is outright bribery of a public official. But because it is often difficult to prove bribery directly, courts have recognized a second form of honest services fraud, involving the failure by a public official to disclose a conflict of interest. *United States v. Antico*, 275 F.3d 245, 262–63 (3d Cir.2001). The danger of the second form of honest services fraud is that it may be overly broad: minor conflicts of interest that an elected official cannot help but encounter could conceivably subject the official to criminal liability for honest services fraud. *See, e.g., United States v. Kincaid–Chauncey*, 556 F.3d 923, 940 (9th Cir.2009); *United States v. Bloom*, 149 F.3d 649, 654 (7th Cir.1998). Thus, this court has suggested, without unequivocally deciding, that a public official is guilty of honest services fraud only if his failure to disclose a conflict of interest violated state law. *United States v. Panarella*, 277 F.3d 678, 698–99 & n. 9 (3d Cir.2002). *Panarella* came close to providing a definition of the second form of honest services fraud when it stated that,

where a public official conceals a financial interest in violation of state criminal law and takes discretionary action in his official capacity that the official knows will directly benefit the concealed interest, the official has deprived the public of his honest services, regardless whether the concealed financial interest improperly influenced the official's actions. *Id.* at 680. Under this definition, only a public official could be the principal offender in the second form of honest services fraud, but a private citizen may be guilty of honest services fraud for aiding and abetting a public official in committing the offense. *See United States v. Kemp,* 500 F.3d 257, 292–93 (3d Cir.2007).

■■■ Three elements must be met for a defendant to be found guilty of either form of honest services mail fraud. The government must prove beyond a reasonable doubt "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails or interstate wire communications in furtherance of the scheme." *Antico,* 275 F.3d at 261. At issue in this case is the second element.[2] Carbo argued, and the district court agreed, that he lacked the requisite specific intent to defraud because he did not know enough about Biondi's disclosure requirement to have acted with the intent to further a scheme to evade it.

■■ The government objects to the premise of Carbo's argument. According to the government's view, the extent of Carbo's knowledge of the state ethics laws is irrelevant because ignorance of the law is no excuse. Even if Carbo was entirely unaware of Biondi's disclosure requirements, he was still guilty of honest ser-

vices fraud as long as he aided and abetted the scheme to disguise Biondi's conflicts of interest. We cannot accept the government's position. It is true that, with respect to most specific-intent crimes, including mail fraud in most circumstances, ignorance of the law is no excuse. *See United States v. Paradies,* 98 F.3d 1266, 1285 (11th Cir.1996) ("In mail fraud cases, the government need only prove that the defendant had the intent to deceive, and ignorance of the law is no defense.") There is an exception to this rule, however, when intent to violate a legal duty is an element of a crime. As an example, consider *United States v. Rhone,* 864 F.2d 832 (D.C.Cir.1989), in which the D.C. Circuit overturned a conviction for mail fraud because the judge erroneously instructed the jury that ignorance of the law was no excuse. The alleged fraud in *Rhone* consisted of the defendant's scheme to continue to collect unemployment benefits after she had obtained a new job. *Id.* at 833. The trial court instructed the jury that mail fraud was a specific intent crime, but that "ignorance of the law is no excuse." *Id.* at 834. The Court of Appeals overturned the conviction because the defendant's conduct could constitute fraud only if she knew that it was illegal for her to continue to receive benefits. *See id.* at 836–37. Without that knowledge, she could not have formed the intent to defraud, which was an element of the crime. *See id.*

The same principle applies to Carbo's alleged offense. To understand why, it is necessary to examine the limitation on honest services mail fraud in *Panarella. See* 277 F.3d at 697–99. In *Panarella,* this court was required to decide whether a

---

2. Because conspiracy and aiding and abetting both require that the defendant specifically intend to further the substantive offense, *see Salinas v. United States,* 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997); *United States v. Dixon,* 658 F.2d 181, 189 n. 17 (3d Cir.1981), our analysis is the same for both.

public official could be convicted of honest services fraud even if there was no allegation that the conflict of interest had affected the official's actions.[3] *See id.* at 690–91. The court recognized that the statute forbidding honest services fraud lacks detail, and that, without some refinement, it might subject an official to criminal liability for ordinary conduct of daily life. *See id.* at 699. In order to avoid this problem, the court adopted a requirement imposed by state law as a limiting principle. *Id.* at 692–93. Because the official's failure to disclose his conflicts of interest violated state ethics laws, the *Panarella* court was satisfied that the misconduct rose to the level of criminal fraud. *See id.* at 695–96. Specific intent was not at issue in *Panarella,* and the opinion does not address whether a defendant must *knowingly* violate a legal disclosure requirement in order to be guilty of honest services fraud. This is unsurprising: when a case deals with honest services mail fraud committed by a public official, the knowledge requirement will not normally be an issue, because public officials like Biondi will almost always be aware of the requirement imposed on them by state ethics laws to disclose conflicts of interest. When, as here, however, the defendant is a private citizen who has not been entrusted with a position in service of the public and who may very well have no understanding of ethics laws, the question of the defendant's

knowledge of the law becomes much more important.

■ Although *Panarella* did not deal with the issue of specific intent directly, the court's principle of avoiding the criminalization of innocent conduct is readily applicable to the question. *Panarella* held that a violation of a state law ethics requirement was sufficient to support a conviction for honest services mail fraud in part because the illegality of the conflict of interest under state law drew a clear distinction between innocent behavior and criminal activity. *See id.* at 699. Knowledge that an undisclosed conflict of interest is illegal places a private citizen on notice that, by assisting the public official to disguise the conflict, he is not merely lobbying, but is engaged in a criminal conspiracy. If a defendant could be convicted of honest services fraud without knowing that his actions violated state ethics law, criminal liability for honest services fraud might expand in exactly the way the *Panarella* court meant to avoid. We hold that, when a private citizen is charged with aiding and abetting or conspiracy to commit honest services fraud by a public official, the prosecution must prove that the defendant knew that the public official was required by law to disclose the conflict of interest.[4] Without the knowledge that the failure to disclose the conflict of interest is illegal, we cannot be certain that the de-

---

3. The defendant in *Panarella* was actually a private citizen accused of being an accessory to honest services fraud after the fact, but because he conceded that he would be guilty if the public official were guilty, the court analyzed the case from the perspective of the public official. 277 F.3d at 689.

4. *Panarella* held that a state-law violation was sufficient to prove honest services fraud, but declined to decide whether such a violation was necessary. *See* 277 F.3d at 699 n. 9 We likewise decline to resolve this question. It might be possible, for example, that a local

ethics law like the one contained in the Norristown Home Rule Charter could answer the concerns of the court in *Panarella* by distinguishing clearly between innocent and impermissible conflicts of interest. In the current case, we conclude that Carbo did knowingly violate state law, and thus we need not decide whether anything other than a state law violation could suffice for a conviction for honest services fraud. Regardless of whether a conviction may be based only on state law, or on some other source, knowledge of that law or other source is required for specific intent.

fendant formed the specific intent to defraud the public.

■ Our conclusion is merely an application of the rule that, "in order to convict a defendant of aiding and abetting, the government must prove that 'the defendant charged with aiding and abetting that crime knew of the commission of the substantive offense and acted with the intent to facilitate it.'" *Kemp*, 500 F.3d at 293 (quoting *Dixon*, 658 F.2d at 189 n. 17). The key phrase for our purposes is "knew of the commission of the substantive offense." Because the violation of state law is critical to distinguishing between acceptable political deal-making and criminal deprivation of the public's right to the honest services of public officials—in other words, between normal politics and fraud—a defendant who does not know of the state law cannot be said to have known of the commission of the substantive offense. This need not create an insurmountable obstacle to prosecutors. In order to satisfy *Panarella*'s concerns about overbreadth, it is not necessary to demonstrate that the defendant knew the fine details of an official's reporting requirements. If the evidence is sufficient for a reasonable jury to conclude that the defendant participated in a scheme to assist a public official in hiding a conflict of interest, and that the defendant knew that the law forbade the official from engaging in that form of undisclosed conflict of interest, a conviction for honest services mail fraud should be upheld.

The District Court was correct to hold that the doctrine of "ignorance of the law is no excuse" does not apply to this case, but it erred by imposing too high of a standard of proof on the prosecution. The District Court justified its decision to grant a judgment of acquittal by pointing to cases like *United States v. Wexler*, 838 F.2d 88 (3d Cir.1988), in which a conviction was overturned because the evidence was insufficient to show that the defendant meant to aid and abet a specific offense. In *Wexler*, the prosecution produced evidence that strongly suggested that the defendant knew he was involved in a plot to transport some sort of contraband. *Id.* at 91–92. Nevertheless, we held that the defendant could not be convicted of aiding and abetting the distribution of drugs because the evidence was equally consistent with the possibility that the defendant believed he was transporting some other form of contraband. *Id.* at 92.

But the government need not conclusively eliminate every other possibility before the jury may reasonably infer that a defendant was guilty of aiding and abetting a particular offense. *See Kemp*, 500 F.3d at 293. In *Kemp*, a case involving multiple defendants in a conspiracy to bribe Corey Kemp, the Treasurer of Philadelphia, one of the defendants argued that he was not guilty of aiding and abetting or conspiracy because he did not know that he was assisting in the commission of honest services fraud, rather than some other illegal activity. *Id.* at 292. The defendant was accused of assisting a lawyer in bribing Kemp. *Id.* at 293. He wrote a check and transferred money to Kemp at the lawyer's behest, while knowing about the public official's position and that the lawyer was politically connected. *Id.* The defendant argued that his actions were equally consistent with aiding and abetting money laundering or with tax evasion, and that therefore the jury could not reasonably conclude that he meant to aid and abet the offense of honest services fraud. *Id.* Nevertheless, we upheld the conviction, pointing out that "the government's theory [of honest services fraud] specifically accounts for Kemp's position as a public official in a way that [the defendant's] other proposed crimes do not." *Id.*

■ Under this standard, the prosecution presented sufficient evidence to convict Carbo. The jury could reasonably conclude that Carbo knew not only that his dealings with Biondi were somehow inappropriate, but that the illegality was directly connected to Biondi's role as Borough administrator. Carbo may well have had an innocent explanation for paying Biondi in cash—particularly because he paid others in cash as well—but it is not easy to find an innocent explanation for his practice of listing Biondi in his own records under a code name and keeping the payments to Biondi, but not to other payees, secret from even his own employees. In particular, the secretly recorded conversation with a government informant demonstrated that Carbo knew that the need for secrecy was due to Biondi's position with the Borough. Carbo worried that Biondi and Mazzerle were creating a "paper trail to hell" by being indiscreet in their dealings and that auditors would uncover the scheme. These comments were made in the context of a discussion about Biondi's conflict of interest in assigning work to contractors. The evidence supports one theory much more strongly than any other: that Carbo acted in order to assist Biondi in keeping his conflict of interest secret. Furthermore, the level of secrecy and misdirection with which Carbo conducted his dealings with Biondi, coupled with the statements Carbo made in the recorded conversation, strongly suggest that Carbo knew that Biondi's embrace of these conflicts of interest was illegal and could potentially have dire consequences for Biondi if they were discovered.

The evidence indicated that Carbo acted with the intent to further what he knew to be an illegal scheme and, as in *Kemp,* the evidence more strongly supported the inference that Carbo intended to assist Biondi in disguising his conflict of interest than

any other crime. While it may be that Carbo did not know the details of Biondi's reporting requirements under state law, the jury could have reasonably inferred that he did know that he was assisting Biondi to violate a legal duty to avoid undisclosed conflicts of interest. The evidence was not overwhelming, but all that was required was that "any rational juror could have found the elements of the crime beyond a reasonable doubt." *United States v. Cartwright,* 359 F.3d 281, 286 (3d Cir.2004) (internal quotation marks omitted). Under this highly deferential standard, the jury's verdict must be upheld, and the District Court's judgment of acquittal overturned.

## IV. CONCLUSION

Even if Carbo did not know the details of Biondi's disclosure requirements, the evidence was sufficient for a reasonable jury to conclude that Carbo had the specific intent to aid and abet honest services mail fraud, and to conspire to commit honest services mail fraud. Therefore, the order of the District Court acquitting defendant will be **REVERSED,** and the case **REMANDED** with instructions to reinstate the verdict and for further proceedings in accordance with this opinion.