NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-2711
_____

UNITED STATES OF AMERICA,
                                        Appellant

v.

RICHARD DRESSEL,
A/K/A BUZZY

_____

On Appeal from the District Court
for the District of New Jersey
D.C. Criminal No. 2-12-cr-00702-001
District Judge: Honorable William J. Martini
_____

Argued:  January 12, 2015

Before: MCKEE, Chief Judge, HARDIMAN, and SCIRICA, Circuit Judges

(Filed: August 12, 2015)

Mark E. Coyne, Esq.
John F. Romano, Esq. [ARGUED]
Office of the United States Attorney
970 Broad Street
Room 700
Newark, NJ  07102

        *Counsel for Appellant*

Alice M. Bergen, Esq.
Jeffrey D. Smith, Esq. [ARGUED]
DeCotiis, Fitzpatrick & Cole

500 Frank West Burr Boulevard
Glenpointe Centre West, Suite 31
Teaneck, NJ 07666

    *Counsel for Appellee*

_____

OPINION[*]

_____

**SCIRICA**, Circuit Judge

A jury convicted Richard Dressel of embezzlement of union funds in violation of 29 U.S.C. § 501(c) and conspiracy to embezzle union funds in violation of 18 U.S.C. § 371. Post-trial, the District Court granted Dressel's motion for acquittal under Federal Rule of Criminal Procedure 29(a) on the ground that the government had not presented sufficient evidence for conviction. We will reverse and remand.

**I.**

In March 2008, without soliciting bids, Dressel hired his live-in girlfriend, Kathy Libonati, to provide in-house catering services as a salaried employee of Local 164 of the International Brotherhood of Electrical Workers ("Local 164"). The two later married. At the time Dressel hired Libonati, he held the highest position in Local 164 as its Business Manager.

Local 164, an electrical workers' union with approximately 3000 members, sponsored the Joint Apprentice Training Fund ("JATF"), an employee welfare benefit

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

plan that provided Local 164 apprentices with a five-year training program consisting of classroom instruction and on-the-job training. JATF was administered by a board of trustees and paid apprentices a salary for attending classes four days per week. During the times relevant to this appeal, Dressel and his alleged co-conspirator, John DeBouter, held positions in both Local 164 and JATF. Dressel served as Local 164's Business Manager and as a JATF Trustee, while DeBouter served as Local 164's President (a position below Business Manager) and JATF's Training Director.

In 2008, Local 164 paid Libonati $46,062 in base salary and a benefits package worth approximately half of total compensation. It is this payment that forms the basis of the embezzlement and conspiracy charges reviewed here. A primary justification for Libonati's Local 164 salary was her involvement in catering JATF's "Captive Lunch Program" ("Lunch Program"). In pitching the Lunch Program to the JATF Board of Trustees ("JATF Trustees"), DeBouter represented that the Lunch Program was needed because apprentices were coming back from lunch drunk and late for class. Prior to the Lunch Program, apprentices either brought their own lunch or went off campus. The JATF Trustees approved the Lunch Program pending information about its cost. DeBouter later notified the JATF Trustees and Local 164 membership that the Lunch Program would cost $8 per person per day. The ultimate cost of the Lunch Program was more than $8 per person per day, but neither party disputes that the Lunch Program was ultimately implemented by Libonati and served 25 to 45 JATF apprentices a day for four days per week.

Though the Lunch Program did not begin to serve meals until mid-May 2008, Local 164 began to pay Libonati's salary in March 2008. Nonetheless, Dressel argued Libonati performed a number of tasks for Local 164 outside of the Lunch Program, including catering retiree lunches, labor walks, Local 164's Christmas party, apprentice orientation and graduation, and annuity dinners. Specifically, Dressel pointed to Libonati's catering of the Graybar trade show in May of 2008, a 1000-person, two-day event hosted by Local 164 and JATF. Libonati also is alleged to have expanded Local 164's charitable efforts with Hackensack University Medical Center's children's cancer center.

By 2010, Local 164 was in a dire financial position. Dressel and DeBouter sought to remedy Local 164's financial condition by having JATF reimburse Local 164 for $108,196.56, equaling half of Libonati's salary from March 2008 to February 2010. DeBouter eventually secured payment from JATF, even though JATF Trustees had yet to approve the expenditure.

## II.

A grand jury indicted Dressel and DeBouter on eight counts arising out of unlawful payments made by Local 164 and JATF to Libonati. Counts 1 through 3 related to payments made by Local 164 and Counts 4 through 8 to payments by JATF. Count 1 charged that Dressel conspired with DeBouter and others to embezzle funds from Local 164 via salary payments to Libonati in violation of 18 U.S.C. § 371. Counts 2 and 3 charged Dressel with embezzling Local 164 funds in violation of 29 U.S.C. § 501(c) for

4

two distinct time periods. Count 2 related to payments made from March 2008 to January 2009, while Count 3 related to payments from February 2009 to February 2010.

The government's theory at trial was that the Lunch Program and Libonati's salary were unnecessary expenses placed on Local 164 and JATF simply because Dressel was dating and living with a caterer. The jury convicted Dressel on Counts 1 and 2 and acquitted him on Counts 3 through 8. As noted, the District Court subsequently granted Dressel's Rule 29 motion for acquittal on Counts 1 and 2. Accordingly, only the embezzlement charge of Count 2 and the conspiracy charge of Count 1 are at issue in this appeal. In granting Dressel's motion for acquittal on the Count 2 embezzlement charge, the trial court explained that "no rational jury could conclude that the Government met its burden to prove beyond a reasonable doubt that Dressel acted with the fraudulent intent necessary to sustain a conviction . . . ." Key to the court's analysis was its finding that Libonati's hiring was authorized and that she provided genuine services to Local 164. With regard to the Count 1 conspiracy charge, the court reasoned that acquittal was required because Libonati's Local 164 salary did not constitute a substantive crime and there was no evidence that Dressel and DeBouter agreed to anything more nefarious than what was achieved.

## III.[1]

In reviewing a jury's verdict of conviction for sufficiency of evidence, we apply a "particularly deferential standard of review" and require the defendant to carry a heavy

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. Our jurisdiction is pursuant to 18 U.S.C. § 3731. We review a district court's grant of a motion for judgment of acquittal under Rule 29 de novo. *See, e.g.*, *United States v. Carbo*, 572 F.3d 112, 113 (3d Cir. 2009).

5

burden. *See, e.g.*, *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998). To prevail on appeal, the defendant must show that—considering the evidence "in the light most favorable to the government . . . [and] credit[ing] all available inferences in favor of the government," *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003)—no "rational trier of fact could have found proof of guilt beyond a reasonable doubt," *United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010) (citation omitted). The essential question is thus not whether we believe "that the evidence at the trial established guilt beyond a reasonable doubt," but rather whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). In evaluating whether defendant has met this burden, we "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence." *United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010) (citation omitted). To permit a finding of insufficiency, the jury's verdict must be "so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012).

## A.

The prohibition against the embezzlement of union funds under section 501(c) is designed to create a "broad prohibition on pilfering union funds" and punish "unconventional chicanery" by reaching novel schemes and closing the "gaps and crevices" from which other statutes had allowed "'guilty men [to] . . . escape[] through the breaches.'" *United States v. Lore*, 430 F.3d 190, 200, 202-03 (3d Cir. 2005) (quoting *United States v. Silverman*, 430 F.2d 106, 126-27 (2d Cir. 1970)). A conviction under

6

section 501(c) requires a misuse of union funds with fraudulent intent. *See Lore*, 430 F.3d at 201; *United States v. Durnin*, 632 F.2d 1297, 1300 (5th Cir. 1980) ("[I]t is clear that fraudulent intent to misuse the funds is the cornerstone of [501(c) embezzlement]."). Fraudulent intent exists where a union officer or employee takes union funds "'knowing that the [union] would not have wanted that to be done.'" *Lore*, 430 F.3d at 201 (quoting *Silverman*, 430 F.2d at 126-27).

Determining whether there was sufficient evidence for the jury to find fraudulent intent requires an examination of the "totality of the circumstances." *United States v. Oliva*, 46 F.3d 320, 324 (3d Cir. 1995). We have rejected approaches that treat union authorization and union benefit as absolute defenses to a finding of fraudulent intent because considered alone they "do not adequately protect union members and their funds." *Id.* at 323. Instead, under our analysis, union authorization and benefit are "merely factors that may be considered as bearing on intent" within the larger totality of the circumstances analysis. *Id.* at 324.

Accordingly, we look to all factors that bear on whether Dressel had a fraudulent intent to misuse funds. *See id.* at 323-24. Looking to all relevant factors, we find that a rational jury could have found beyond a reasonable doubt that Dressel took the property of Local 164 "'knowing that [Local 164] would not have wanted that to be done.'" *Lore*, 430 F.3d at 201 (quoting *Silverman*, 430 F.2d at 126-27). While the constitution and bylaws of Local 164 may have authorized Dressel to hire Libonati, the jury heard evidence that provided grounds to rationally question the benefit Local 164 received in return for Libonati's salary. In addition, there was evidence that Dressel hired his live-in

7

girlfriend without soliciting bids, misrepresented the need for and cost of the Lunch Program to JATF Trustees, and engaged in strong-arm tactics that created a culture where dissent was not tolerated—all while Local 164 was in a dire financial condition.

*Benefit*

A gross disconnect between services rendered and compensation is probative of fraudulent intent, *see, e.g.*, *United States v. Andreen*, 628 F.2d 1236, 1244 (9th Cir. 1980), and the jury heard evidence that there was a gross disconnect between Libonati's salary and the services she provided Local 164. Specifically, while Dressel relies on Libonati's implementation of the Lunch Program as a major justification for her Local 164 salary, there was evidence that the program was unneeded. Assistant Training Director David Milazzo testified that the Lunch Program "wasn't necessary" because the primary problem it purported to correct, apprentice lunchtime drinking, did not exist. The provision of an unneeded service does not confer a substantial benefit. Accordingly, a rational jury could have found that the Lunch Program provided only an incidental benefit to Local 164.

The same is true of the Graybar trade show. While Libonati may have spent time preparing for the trade show, it was not a Local 164 event. Rather, the event was put on by Graybar, a large electrical supplier. Local 164 facilities may have been used, but it is unclear why Local 164 would have paid Libonati anything to cater it. Even considering the fees received for hosting the trade show, a rational jury could have found this benefit to be incidental given that Local 164 would have been entitled to fees for the use of its facilities even if an outside caterer had been used.

8

In addition, Local 164 Office Manager, Joan Farkas, testified that Libonati "performed no service for [Local 164] in 2008." While this statement is contradicted by evidence that Libonati catered other small events in 2008, it is nonetheless evidence that Libonati's involvement at Local 164 was limited. A rational jury could have inferred from Farkas's testimony that if Libonati was providing services to Local 164 in proportion to her compensation, the Office Manager would have been aware of it.

### *Misrepresentations*

Making misrepresentations in getting an expenditure approved is probative of fraudulent intent, *see United States v. Butler*, 954 F.2d 114, 119 (2d Cir. 1992) ("An authorization obtained without disclosure of . . . material information is obviously a nullity."), and there was evidence that DeBouter and Dressel misrepresented both the need for and the cost of the Lunch Program.

With regard to need, a primary justification for the Lunch Program was DeBouter's representation to JATF Trustees that there was a problem with apprentices drinking during their lunch hour. But JATF's Assistant Training Director David Milazzo testified that the Lunch Program "wasn't necessary" because there was no problem with apprentices coming back from lunch intoxicated. This testimony was corroborated by (1) another faculty member, who stated that he "never had students come back [from lunch] that [he] thought were drinking" and that he "did not see it was a problem," and (2) JATF Trustees in charge of disciplining apprentices, who testified that they had not seen issues with apprentice alcohol abuse during lunch.

As for cost, multiple witnesses testified that DeBouter's pitch of the Lunch Program to the JATF Trustees led them to believe that "total cost" included compensating Libonati. JATF Trustee Darryl Parchment testified that the cost of the Lunch Program was "$8.00 per student per day . . . . That's all it was supposed to be." Trustee Anthony D'Anna explained that "I know [Libonati] was supposed to be paid out of the $8.00." Dressel responds that the total cost of the Lunch Program was ascertainable, and thus that there was no misrepresentation, because Libonati's Local 164 salary was disclosed in the filing of a LM-2 form that was available to the public. But even if the JATF Trustees were aware of Local 164's salary to Libonati, there would be no reason for the Trustees to believe that JATF would ultimately become responsible for half of that salary—which ultimately was the case after JATF's 2010 reimbursement of half of the salary paid by Local 164 to Libonati from March 2008 to February 2010.

Accordingly, a rational jury could have found that the JATF Trustees approved the Lunch Program on the basis of misrepresentations about the need for the program and its cost. In addition, the jury could have inferred that Dressel and DeBouter misrepresented the need for and cost of the Lunch Program in order to get the program approved and provide a justification for Libonati's Local 164 salary.

### *Dire Financial Condition*

A union's dire financial condition is probative of fraudulent intent—as one is more likely to know an expenditure is not in the best interest of the union where it is in a dire financial condition. *See United States v. Welch*, 728 F.2d 1113, 1119-20 (8th Cir. 1984). There was evidence that Local 164 was in a dire financial condition throughout the

10

relevant time periods, especially in 2010, when it sought reimbursement of Libonati's salary from JATF. A rational jury was entitled to look at Local 164's financial difficulties and infer that Dressel knew paying Libonati's salary was not in Local 164's best interest.

### *Strong-Arm Tactics*

The use of strong-arm tactics is also probative of fraudulent intent, *Butler*, 954 F.2d at 119, and there was evidence that Dressel and DeBouter engaged in strong-arm tactics that created a culture where dissent was not tolerated. In pitching the Lunch Program to the JATF trustees, DeBouter listed all of the problems justifying the need for the Lunch Program and asked JATF Assistant Training Director David Milazzo "[i]sn't that right, Dave?" Milazzo responded that he had seen issues with apprentice drunkenness, alcoholism, and tardiness. But during his trial testimony, Milazzo testified that his explanation to the JATF Trustees was "false" and that he "just wanted to follow the bosses." Milazzo's willingness to "follow" is understandable given testimony that Dressel and DeBouter were known to harshly punish dissent. For example, there was evidence that DeBouter responded to a JATF instructor's objections to the necessity of the Lunch Program with "if you don't like it, you can find another F'n job." In addition, another JATF Trustee testified that he was terminated after taking a contrary position to Dressel and DeBouter at a JATF Trustees meeting.

There was also evidence that Dressel and DeBouter engaged in strong-arm tactics during the reallocation of Libonati's salary in 2010. On March 23, 2010, DeBouter first raised the issue of JATF reimbursing Local 164 for half of Libonati's salary from March 2008 to February 2010, totaling $108,196.56, which the JATF Trustees declined to

approve without a letter from JATF's attorney. Prior to receiving approval from JATF's attorney, DeBouter successfully demanded that JATF Office Manager Donna McManus hand over a check in the amount of $108,196.56. It is undisputed that DeBouter lacked the authority to unilaterally approve the reimbursement. In addition, McManus testified that she was "upset" over being forced to relinquish the check "because [she] felt like [she] was doing something wrong." The check was deposited and spent within three days. After already taking and spending the money, on March 30, 2010, DeBouter called a special meeting where he again asked the JATF Trustees to approve the reimbursement. The Trustees again refused to authorize the payment without an attorney letter on the legality of the reimbursement. In explaining why the JATF Trustees declined to approve the reimbursement without an attorney letter, JATF Trustee Darryl Parchment testified that "the Board didn't feel comfortable with approving a salary that just didn't seem right." Ultimately, the attorney letter was not received until April 7, 2010, with DeBouter directing a JATF trustee to add a paragraph to the minutes for the April 13, 2010, meeting reflecting review of that letter, even though no such review had taken place. A rational jury could have used the above strong-arm tactics as evidence of Dressel's intent to defraud Local 164.

*　　*　　*

Considered under the totality of the circumstances and viewed in the light most favorable to the government, we believe the above evidence was sufficient for a rational jury to have found beyond a reasonable doubt that Dressel took the property of Local 164 "'knowing that [Local 164] would not have wanted that to be done.'" *Lore*, 430 F.3d at

12

201 (quoting *Silverman*, 430 F.2d at 126-27); *Oliva*, 46 F.3d at 324. Accordingly, the jury's conviction under section 501(c) was not irrational and we will reverse.

**B.**

To convict Dressel of conspiracy in violation of 18 U.S.C. § 371, the jury was required to find that: (1) two or more persons agreed to commit offenses against the United States; (2) Dressel was a party to or a member of that agreement; (3) Dressel and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective to commit an offense against the United States; and (4) at some time during the existence of the agreement or conspiracy, at least one of the members performed an overt act in order to further the objectives of the agreement. *See United States v. Rankin*, 870 F.2d 109, 113 (3d Cir. 1989); 3d Cir. Crim. Model Jury Instructions § 6.18.371A.

There was evidence of an agreement between Dressel and DeBouter to embezzle Local 164 funds. According to Milazzo's testimony, DeBouter said that the reallocation of half of Libonati's salary to JATF in 2010 "wasn't part of the deal." Milazzo explained that he understood DeBouter's statement to mean that JATF would be responsible solely for paying Libonati's catering company, and not any Local 164 salary. Consistent with Milazzo's testimony, Local 164's current Business Manager testified that Dressel's and DeBouter's positions with Local 164 and JATF made them uniquely knowledgeable about how Libonati was being compensated from both entities. Viewed in the light most favorable to the government, a rational jury could interpret DeBouter's statement as indicating an agreement between Dressel and DeBouter to provide Libonati with a

13

salaried position at Local 164 through creation of the Lunch Program so long as JATF was not responsible for Libonati's actual salary.

There was also evidence of multiple overt acts in furtherance of the agreement and an intent to achieve the agreement. Dressel and DeBouter worked together in misrepresenting the need for and cost of the Lunch Program and in creating an atmosphere where dissent was not tolerated. When Dressel needed funds for Local 164 in 2010, there was evidence that DeBouter carried out the scheme by demanding and acquiring a check from JATF for half of Libonati's salary from 2008 to 2010, even though the transaction had yet to be approved by JATF Trustees.

Viewed in the light most favorable to the government, the above evidence was sufficient for a rational jury to have found beyond a reasonable doubt that Dressel and DeBouter conspired to embezzle Local 164 funds in violation of 18 U.S.C. § 371. Accordingly, the jury's conviction under section 371 was not irrational and we will reverse.

## IV.

For the foregoing reasons, we find that the jury's verdict was not irrational, as there was sufficient evidence to convict Dressel of embezzling union funds in violation of 29 U.S.C. § 501(c) and conspiring to embezzle union funds in violation of 18 U.S.C. § 371. We will reverse the grant of Dressel's motion for acquittal and remand for reinstatement of the jury's verdict.